SECURITIES AND EXCHANGE
COMMISSION, Plaintiff–
Appellant,

v.

DAIN RAUSCHER, INC.; Kenneth D.
Ough; and Virginia O. Horler,
Defendants–Appellees.

No. 99–56828.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 9, 2001

Filed June 26, 2001

John W. Avery, Securities and Exchange Commission, Washington, DC, for the plaintiff-appellant.

Charles Rice, Shartsis Friese & Ginsburg, San Francisco, California, for the defendant-appellee.

Nicholas P. Coleman, Wilmer, Cutler & Pickering, Washington, DC, for amici in support of the defendant-appellee.

Before: PREGERSON, CANBY, and THOMPSON, Circuit Judges.

DAVID R. THOMPSON, Circuit Judge:

The Securities and Exchange Commission (SEC) sought a permanent injunction and civil penalties against Kenneth D. Ough for alleged violations of Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a) (1994), *amended by* Pub.L. 106–554 § 302(b), 114 Stat. 2763, 2763A–452 (Dec. 21, 2000); Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) (1994), *amended by* Pub.L. 106–554 § 303(d), 114 Stat. 2763, 2763A–454 (Dec. 21, 2000), and Rule 10b–5 thereunder, 17 C.F.R. 240.10b–5 (2000); and for violations of Section 15B(c)(1) of the Exchange Act, 15 U.S.C. § 78o–4(c)(1) (1994), and Municipal Securities Rulemaking Board (MSRB) Rule G 17.[1]  The al-

---

1. The SEC's claims against the other defendants are not involved in this appeal.

leged violations stem from Ough's acts and omissions as an investment banker for an underwriter of municipal offerings in his investigation and disclosure of the risks attached to the offering of certain taxable municipal notes.

The district court entered summary judgment in favor of Ough, and the SEC appeals. The SEC contends the district court erred in looking solely to the industry standard as the governing standard of care by which to measure Ough's conduct. Further, the SEC asserts there is a genuine issue of material fact as to what the industry standard is, and as to whether Ough's conduct departed from that standard or from a standard of "reasonable prudence" which the SEC contends is the appropriate standard.

We have jurisdiction pursuant to 28 U.S.C. § 1291 (1994), and we reverse. We hold that the standard of care for an underwriter of municipal offerings is one of reasonable prudence, for which the industry standard is one factor to be considered, but it is not the determinative factor. We also conclude there are genuine issues of material fact as to what is the applicable industry standard, whether Ough's conduct met the controlling standard of reasonable prudence, and whether any departure from that standard was so extreme as to satisfy the element of *scienter* under the securities antifraud statutes and regulations.

## I.

In 1993 and 1994, Dain Rauscher, a broker-dealer, was the senior underwriter for nine taxable municipal note offerings, and financial advisor for a tenth offering. Kenneth D. Ough, vice president in the public finance department of Dain Rauscher's municipal securities division, acted as lead investment banker on these undertakings. Two of the offerings were for the City of Anaheim, and eight were for various municipal school districts.

At the time the taxable municipal notes were offered, they were a new type of security. The 1993 Anaheim transaction was one of the first such offerings ever made. With this type of security, the issuers, all of whom were "municipalities," used the note proceeds for "interest arbitrage," meaning that the proceeds were used solely for investment purposes, rather than for infrastructure improvement, debt reduction or other projects. The goal of "interest arbitrage" is to pay back invested money at a certain interest rate, but invest it at a higher rate so that the issuers make a profit equal to the spread between interest rates. In this case, all of the issuers invested the note proceeds in investment pools managed by Orange County Treasurer Robert Citron.

In underwriting the offering of the taxable municipal notes, the underwriter followed the procedure for underwriting the offering of municipal bonds. That procedure requires the underwriter to obtain and review an official statement and send it to potential bidders or purchasers. *See* 17 C.F.R. § 240.15c2–12(b) (2000). Here, as the principal investment banker for the underwriting firm, Ough helped prepare and draft the offering documents. Others were also involved in drafting those documents, including bond counsel, underwriting counsel and public officials. Ough was responsible for reviewing the final offering statements prior to issuance of the notes.

The Anaheim offering statements provided that the purpose of the issuance was to "provide moneys to meet the City's Fiscal Year ... general fund expenditures, including current expenses, capital expenditures and the discharge of other obligations or indebtedness of the City." The school districts' offering statements were almost identical, although they included

"investment and reinvestment" in the list of expenditures to be met with proceeds from issuance of the notes. All of the offering statements explained that the issuance proceeds would be invested directly or through investment agreements "to the greatest extent possible" by the city Treasurer or the school district's Treasurer–Tax Collector.

Although Ough was aware that the purpose of the issuances was interest arbitrage, none of the offering statements used that term. Ough also knew the money would be invested in the Orange County investment pools, but no offering statement disclosed that fact. Ough never discussed the pools' investment strategy with Citron, the manager of the Orange County investment pools, and he did not make inquiries about the specific portfolio of investments and securities held by the pools. Ough said that reviewing such portfolios was not his expertise.

In evaluating the risk level to investors, Ough relied on statements and presentations by the Assistant Treasurer for Orange County, the Treasurer of the City of Anaheim, analysis and ratings by Standard & Poor's and Moody's, the history of the Orange County pool investments, and Citron's investing and management record. Ough said that he believed the pools' investments were conservative and safe, and that Citron had "strong management expertise."

Citron's strategy was to invest in securities that were highly sensitive to interest rate changes. As long as interest rates declined or held steady, returns on investments in the pools were high. In 1994, however, the Federal Reserve raised rates. The rate increase caused significant losses in the value of the Orange County portfolio and ultimately led to the Orange County

bankruptcy. Nonetheless, all of the notes issued in the ten offerings in which Ough was involved were repaid in full and on time. Notwithstanding that circumstance, the SEC filed the complaint in this case seeking a permanent injunction and civil penalties against Ough. In its complaint, the SEC alleged that the offering documents misrepresented and omitted material facts that Ough knew, or through reasonable investigation, should have known, including the risks of the investment strategy. According to the SEC, the fact no one lost any money was simply a fortuitous fluke.

Both sides moved for summary judgment. The district court granted Ough's motion. The district court determined as a matter of law that the applicable standard against which to measure Ough's conduct was the industry standard, and held there was no material factual dispute that Ough's actions complied with that standard. This appeal followed.

## II.

■ We review a district court's grant of summary judgment de novo. *Flick v. Liberty Mut. Fire Ins. Co.*, 205 F.3d 386, 390 (9th Cir.2000). Viewing the evidence in the light most favorable to the nonmoving party, we must determine whether the district court correctly applied the relevant law, and whether there is a dispute as to a genuine issue of material fact. *Id.*

## III.

Section 17(a) of the Securities Act, and Section 10(b) of the Exchange Act and Rule 10b–5, prohibit fraudulent conduct or practices in connection with the offer or sale of securities.[2] These antifraud provi-

---

**2.** Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), forbids any person in the offer or sale of any securities by means of interstate commerce

sions forbid making a material misstatement or omission in connection with the offer or sale of a security by means of interstate commerce. *See SEC v. Rana Research, Inc.*, 8 F.3d 1358, 1364 (9th Cir. 1993); *SEC v. Rogers*, 790 F.2d 1450, 1458–59 (9th Cir.1986). MSRB Rule G–17 requires that brokers and dealers deal fairly with others and not engage in deceptive, dishonest or unfair practices.[3]

Violations of Section 17(a)(1), Section 10(b) and Rule 10b–5 require *scienter*. *See Aaron v. SEC*, 446 U.S. 680, 701–02, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980). *Scienter* is satisfied by recklessness. *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1568–69 (9th Cir.1990) (en banc). Reckless conduct is conduct that consists of a highly unreasonable act, or omission, that is an "extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Id.* at 1569 (quoting *Sundstrand Corp. v. Sun Chem. Corp.*, 553 F.2d 1033, 1045 (7th Cir.1977)).

Violations of Sections 17(a)(2) and (3) require a showing of negligence. *SEC v. Hughes Capital Corp.*, 124 F.3d 449, 453–54 (3d Cir.1997). The parties do not dispute that negligence is also the standard by which MSRB Rule G–17 liability is evaluated. *See In the Matter of Merrill Lynch, Pierce, Fenner & Smith Inc.*, 67 SEC Docket 1807, 1998 WL 518489, *13 (Aug. 24, 1998) (applying same standard to alleged Rule G–17 violation as that of Section 17(a)(2) and (3)).

## A.   The Applicable Standard

In challenging the district court's summary judgment, the SEC contends the standard of care by which Ough's conduct must be measured is not defined solely by industry practice, but must be judged by a more expansive standard of reasonable prudence, for which the industry standard is but one factor to consider. We agree.

We have held that "it is well-settled that '[p]roof of adherence to an industry practice or custom is not dispositive of the issue of negligence,' because 'what ought to be done is fixed by a standard of reasonable prudence, whether it usually is complied with or not.'" *Doe v. Cutter Biological, Inc.*, 971 F.2d 375, 383 (9th Cir.1992) (citations omitted). In *Cutter Biological*, patients who became infected with HIV after receiving a blood clotting agent sued the manufacturers of the clotting agent, asserting claims of negligence and strict liability predicated on allegations that the manufacturers had failed to screen the blood for HIV and AIDS. At the time, it was not industry practice to use such screening procedures. We held that evidence of compliance with custom or industry practice was a relevant, but not a

---

(1) to employ any device, scheme, or artifice to defraud, or
(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), makes it unlawful for any person by means of interstate commerce "[t]o use ...

any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe...." Rule 10b–5, 17 C.F.R. § 240.10b–5, provides, "It shall be unlawful for any person ... to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made ... not misleading...."

3. Section 15B(c)(1) of the Exchange Act prohibits a broker-dealer from violating MSRB rules. 15 U.S.C. § 78o–4(c)(1) (1994).

determinative, factor in determining whether the appropriate standard of care had been met. *Id.*

Ough and amici argue that securities professionals should not be held to the standard we articulated in *Cutter Biological.* They contend securities professionals should be judged by industry standards. In support of their argument, they rely on *SEC v. Arthur Young & Co.,* 590 F.2d 785 (9th Cir.1979). There, we held that accountants who acted in accordance with Generally Accepted Auditing Standards (GAAS) were not liable under Section 17(a), Section 10(b) or Rule 10b–5, and that the industry standard, namely compliance with GAAS, was the relevant standard for measuring the accounts' conduct. *Id.* at 788.[4]

*Arthur Young* does not require us to hold that compliance with an industry standard absolves a securities professional from liability under federal securities laws. Our holding in *Arthur Young* was made in the particular context of the accounting profession. *Id.* at 787. GAAS guidelines establish accounting standards that are explicitly defined in authoritative, publicly available pronouncements issued by recognized sources and utilized throughout the accounting profession. *See Potts v. SEC,* 151 F.3d 810, 812 (8th Cir.1998) (GAAS are "well-established norms of the accounting profession").

We decline to extend *Arthur Young* to afford to investment bankers and underwriters the protection afforded accounting professionals who comply with the GAAS guidelines. The standard for which Ough and amici contend is not a time-honored standard set by an authoritative source recognized and followed throughout the profession. Indeed, to the extent there is

any industry standard of conduct for investment bankers and underwriters who participate in offerings of taxable municipal notes, the standard is sparse and not particularly helpful. The asserted industry standard was set, in part, by Ough himself who was one of the first of the securities professionals to participate in such an offering. Other than Ough, only a few others had participated in such an offering, and those who had had done so in only a small number of offerings over a short period of time. Because the industry was comprised of only a few participants who controlled the practice, the standard they developed could fall short of a standard of reasonable care. *See Cutter Biological,* 971 F.2d at 383. There is also a risk in such a circumstance that the standard setters will engage in a "race to the bottom" to set the least demanding standard to assess their conduct.

■ Ough argues, nonetheless, that because there was no statute or regulation explicitly setting forth a standard of care, the only standard to look to is the industry standard. We disagree. The absence of a standard-setting statute or regulation will not elevate to a level of reasonable prudence an otherwise deficient industry standard. The industry standard is a relevant factor, but the controlling standard remains one of reasonable prudence. It is against that standard that we measure Ough's conduct.

B.  Ough's Conduct

■ Ough was a securities professional. A securities professional has an obligation to investigate the securities he or she offers to customers. *See Hanly v. SEC,* 415 F.2d 589, 595–96 (2d Cir.1969) (holding that brokers and salesmen are

---

4. In *Arthur Young,* however, we declined to hold that compliance with GAAS alone would immunize an accountant who failed to reveal material facts that were known or which, but for a deliberate refusal to become informed, should have been known. *Arthur Young,* 590 F.2d at 788–89.

under a duty to investigate and must analyze sales literature and must not blindly accept recommendations made). Ough had a duty to make an investigation that would provide him with a reasonable basis for a belief that the key representations in the statements provided to the investors were truthful and complete. *See Municipal Securities Disclosure,* Exchange Act Release No. 34–26100, 41 SEC Docket 1131 (Sept. 22, 1988), 1988 WL 240748, *20; *see also Sanders v. John Nuveen & Co.,* 554 F.2d 790, 793 (7th Cir.1977) (recognizing that an underwriter has a duty to investigate an issuer, and that reckless failure to do so can give rise to liability under Rule 10b–5).[5]

█ In the district court, the SEC produced three examples of Offering Statements, issued by the City of Santa Barbara, Orange County, and San Diego County in 1993 and 1994. The SEC contends these statements, and the testimony of its expert witnesses, establish at least a genuine issue of material fact as to what the industry standard was and whether a standard of reasonable prudence was met. The Offering Statements the SEC presented as examples of appropriate offering documents more clearly identify, according to the SEC, the arbitrage purpose of the offerings and the intended investment in the Orange County pools. While none used the term "arbitrage," they provided more information than the statements prepared by Ough. For instance, the Orange County statement explained that the proceeds from note sales would be invested in the Orange County investment pools and described the investment policies and risks of the pools.

In contrast, the statements prepared by Ough did not disclose that the proceeds were to be used solely for the purpose of investment, nor did they explain that such proceeds would be invested in the Orange County pools. In addition, one of the expert witnesses proffered by the SEC testified that Ough departed from the standard of the municipal securities industry by failing to disclose the arbitrage purpose of the offerings, and the other testified Ough's conduct did not meet the standard of reasonable prudence. Both experts testified that Ough violated his investigative duty of care by not taking proper steps to gather information about the potential risks of the Orange County investment pools, and one testified that with regard to making a proper disclosure Ough failed to act as a "reasonably prudent municipal underwriter" and "was at the very minimum reckless."

Ough admits he did not personally review the portfolio of the Orange County investment pools, and he did not discuss Citron's investment strategy with him. Ough testified that because he had never heard anything negative about the Orange County investment pools, he "assumed that it was a conservative, safe investment at that particular time." He points out it is undisputed that the Orange County investment pools received high ratings and approval from Standard & Poor's and Moody's, and that he relied on these rat-

---

5. We recognize that municipal issuers are not subject to the same filing requirements imposed on underwriters, dealers, and brokers of other securities. *See* 15 U.S.C. § 78*o*–4(d) (1994). Pursuant to the Tower Amendment, an issuer of municipal securities is not required to file any application, report, or document with the SEC or the MSRB in connection with the issuance of a security. 15 U.S.C. § 78*o*–4(d)(1). However, when state-

ments are made in connection with the offering of a municipal security, those statements must be true and cannot omit material facts. *See Sonnenfeld v. City and County of Denver,* 100 F.3d 744, 748 (10th Cir.1996) ("Congress also clearly intended that municipal securities would remain subject to the antifraud provisions."). And, the duty to conduct a reasonable investigation remains.

ings as well as the assurances of other public officials that the investments were safe.

From our review of the entire record we are persuaded that there are genuine issues of material fact as to what is the appropriate industry standard, whether Ough complied with that standard and, more importantly, whether he complied with the more expansive and controlling standard of reasonable prudence, as to both his investigative and disclosure responsibilities. There is also an issue whether any departure by him from the applicable standard was so extreme as to satisfy the element of *scienter* under the securities antifraud statutes and regulations. *See Hollinger,* 914 F.2d 1564, 1568–69. Accordingly, we reverse the district court's summary judgment and remand for further proceedings.

REVERSED and REMANDED.