327 F.3d 851
 Jerome B. VERNAZZA, Petitioner,
v.
SECURITIES AND EXCHANGE COMMISSION, Respondent.
IMS/CPAS & Associates; Vernon T. Hall; Stanley E. Hargrave, Petitioners,
v.
Securities and Exchange Commission, Respondent.
 No. 01-71857.
 No. 02-70016.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted February 5, 2003.
 Filed April 24, 2003.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Sheldon M. Jaffe, Los Angeles, CA, for petitioner Jerome B. Vernazza.
 Thomas D. Giachetti, Princeton, NJ, and Ashleigh C. Swayze, Stark & Stark, PC, Lawrenceville, NJ, for petitioners IMS/ CPAs & Associates, Vernon T. Hall, and Stanley E. Hargrave.
 Eric Summergrad, Deputy Solicitor, and Mark Pennington, Assistant General Counsel, Securities and Exchange Commission, Washington, DC, for the respondent.
 On Petition for Review of an Order of the Securities & Exchange Commission. SEC No. 3-9042.
 Before D.W. NELSON, WARDLAW and FISHER, Circuit Judges.
 D.W. NELSON, Senior Circuit Judge.
 
 
 1
 Petitioners Jerome B. Vernazza, Vernon T. Hall, Stanley E. Hargrave, and IMS/ CPAs & Associates ("IMS") seek review of an order of the Securities and Exchange Commission ("Commission") imposing sanctions for violations of several antifraud provisions of the securities laws. The Commission determined that the petitioners, who are investment advisers or persons associated with advisers, knowingly or recklessly made materially false statements and omissions to their clients and in their papers filed with the Commission. The Commission found that the petitioners falsely represented that they received no referral fees and had no financial interest in any of the recommendations they made to their clients. Because the Commission's findings are supported by substantial evidence, we deny the petition for review.
 
 
 FACTUAL BACKGROUND
 
 
 2
 The facts are largely undisputed. Vernazza, Hall, and Hargrave are partners in IMS, a firm registered with the Commission as an investment adviser. Vernazza also was registered as an adviser, but withdrew his registration in 1997. Vernazza, Hall, and Hargrave also owned the accounting firm Hall & Vernazza, CPAs ("H&V"), which for all practical purposes was the same business as IMS.
 
 
 3
 World Money Managers ("World") — also a registered investment adviser — had operated as the adviser to the Tax Planning Federal Cash Fund ("Tax Fund"), to which H&V operated as the subadviser. In June 1992, World and H&V closed the Tax Fund due to unprofitability. Ordinarily, the closing costs for an investment fund are paid by the fund itself; in this case, H&V paid the $60,000 closing costs and obtained a loan from World to do so.[1] The promissory note for the loan provided that H&V would repay the loan at a rate of $2,000 per month, with the full amount due by July 1, 1995.
 
 
 4
 The day after the loan was made, World and H&V entered into a Shareholder Servicing Agreement ("SSA"), the terms of which are central to this case. The SSA provided that World would pay H&V for services related to World's Permanent Portfolio Family ("PPF") of Funds, such as marketing the funds and providing tax advice to investors. A schedule to the SSA stated that compensation would be based on "time, effort, and complexity of services at an annual rate not to exceed" a series of percentages of "Additional Assets." "Additional Assets" was defined as the value of the investments in PPF funds made by clients of H&V or IMS. The percentage "caps" ranged from 0.25% to 0.6% of the Additional Assets, depending on which of the three PPF funds the client invested in, whether the client had been previously invested in the Tax Fund, and when the investment was made. The highest percentages were applied to investments made by former Tax Fund clients before June 30, 1995 — the day before the loan was due to be repaid. The SSA did not indicate any other basis, such as an hourly rate of pay, for determining H&V's compensation. The SSA also contained a minimum investment requirement whereby H&V would not be paid at all until its and IMS's clients had purchased at least $1,000,000 in PPF funds.
 
 
 5
 H&V's actual compensation from World was always the maximum amount payable under the SSA caps. Petitioners never sent World an accounting of hours worked, services performed, or hourly rates. The only accounting in the record is a list of the investments made by H&V and IMS clients, with the "Servicing Fee" determined by the percentages in the SSA.
 
 
 6
 According to Vernazza, the reason that H&V's compensation was determined by the caps is that H&V had performed services entitling it to more money than it could recover under the caps. As of the first bill sent to World, H&V had performed services entitling it to about $60,000, but because this amount was greater than the caps, it was paid only according to the caps and the extra amount was rolled over to the next period. This happened throughout the life of the agreement; Vernazza testified that H&V performed services worth a total of about $131,000, but that H&V's compensation was limited by the caps because the value of the services performed exceeded the amount payable under the caps. Vernazza stated that he billed the work at either $100 per hour or $250 per hour; he also stated that H&V had discussed a range of $150-200 per hour with World but had never agreed on a specific hourly figure.
 
 
 7
 The payments made by H&V to World on the $60,000 loan closely tracked the payments made by World on the SSA. H&V missed the first payment on the loan, a $12,000 payment due in January 1993. The payment finally was made on April 12, 1993, the day after H&V received its first SSA payment from World in the amount of $13,060. By September 5, 1993, World had paid H&V $24,431 under the SSA; H&V had in turn paid World $24,000 under the promissory note for the loan. H&V continued to be paid under the SSA until 1996.
 
 
 8
 During this period, petitioners made representations, in engagement letters to their clients, that they had no financial interest in and did not receive commissions for recommending PPF funds. Multiple engagement letters from IMS to its clients, for example, stated that "IMS warrants that they have not and will not receive any commission or any payment from, nor do they have any financial interest in, any recommendation made."
 
 
 9
 Vernazza and IMS also made similar representations in filings with the Commission; as investment advisers, Vernazza and IMS were required to file a "Form ADV" with the Commission and to update it annually. See 17 C.F.R. § 275.204-1(a). The form includes questions about potential conflicts of interest; if any apply to the adviser, they must be explained on Schedule F of the form. Part I, Question 21 asks whether the adviser "recommend[ed] securities to clients during its last fiscal year in which the [adviser] ... had any ownership or sales interest." Part II, Question 8(C)(3) asks whether the adviser "has arrangements that are material to its advisory business or its clients with a related person who is ... [an]other investment adviser." Part II, Question 9(D) asks whether the adviser "[r]ecommends to clients that they buy or sell securities... in which the [adviser] or a related person has some financial interest." Finally, Part II, Question 13(A) asks whether the adviser, or a related person, "receives some economic benefit ... from a non-client in connection with giving advice to clients." IMS and Vernazza originally answered all of the above questions in the negative. In 1992, Vernazza changed his answer to Part II, Question 8(C)(3), stating that, under the SSA, H&V was paid by World for advisory and administrative support services according to "time, effort and complexity of services." IMS did the same, and also mentioned that H&V's compensation was capped at 0.5%-0.6% of the investment in each fund, although it did not mention that these percentages applied only to investments made by H&V/IMS clients. In 1993, IMS also amended the form to answer "yes" to Part II, Question 9(D), and gave a similar explanation of the SSA, including the same description of the caps. Neither Vernazza nor IMS made any other material amendments to the Forms ADV.
 
 
 10
 As advisers, Vernazza and IMS also were required to furnish clients with disclosure statements comprising the same information as Part II of the Form ADV. See 17 C.F.R. § 275.204-3. The disclosure statements for Vernazza, Hall, and Hargrave during 1993-94 all stated that they received no fees or commissions from anyone selling the investments they recommended. They explained that, under the SSA, H&V received compensation from World for advisory and administrative support services, but did not mention the caps.
 
 
 PROCEDURAL HISTORY
 
 
 11
 On July 11, 1996, the Commission's Division of Enforcement initiated proceedings against the petitioners, alleging fraud in violation of both the Securities Act of 1933, 15 U.S.C. §§ 77a-77aa ("Securities Act"), and the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a-78mm ("Exchange Act"), and several violations of the Investment Advisers Act of 1940, 15 U.S.C. §§ 80b-1 to 80b-21 ("Advisers Act"). After a hearing, an administrative law judge ("ALJ") found that the petitioners had committed the violations and issued a cease-and-desist order, suspended Vernazza's and IMS's registrations as advisers, prohibited Vernazza, Hall, and Hargrave from associating with any adviser for six months, and ordered disgorgement of the payments received under the SSA.[2]
 
 
 12
 The ALJ's order was reviewed de novo by the Commission, and it was, in large part, affirmed. The Commission found fraud in violation of several statutes and regulations, and false statements to the Commission in violation of Advisers Act § 207, 15 U.S.C. § 80b-7. The essential basis of all of these violations was that the petitioners had made materially false statements when they represented that they had no financial interest in, nor received any economic benefit from, the investment recommendations they made, and that they made such statements knowingly or recklessly. The Commission found that the SSA was merely a disguised referral fee agreement, in which "World gave [petitioners] the money for the Tax Fund's closing costs in exchange for [petitioners] sending business to World." The Commission also upheld the ALJ's sanctions.[3]
 
 
 13
 Pursuant to Securities Act § 9(a), 15 U.S.C. § 77i(a); Exchange Act § 25(a)(1), 15 U.S.C. § 78y(a)(1); and Advisers Act § 213(a), 15 U.S.C. § 80b-13(a), which give the Courts of Appeals jurisdiction to review final orders of the Commission, petitioners filed petitions for review with the Ninth Circuit. They argued that the Commission erred in finding that petitioners acted with scienter and in excluding the proffered testimony of an expert witness, that the Commission abused its discretion in imposing sanctions, and that the Commission lacks authority to bar association with unregistered advisers.
 
 
 STANDARD OF REVIEW
 
 
 14
 Under all of the statutes in question, the Commission's findings of fact are reviewed for substantial evidence. See 15 U.S.C. §§ 77i(a), 78y(a)(4), 80b-13(a). The Commission's "imposition of sanctions is reviewed for abuse of discretion. Our task is to assure that the sanction is supported by the law and facts, not to revisit the sanction anew or impose our independent judgment on the merits of the sanction." Krull v. SEC, 248 F.3d 907, 912 (9th Cir. 2001) (citations omitted).
 
 
 15
 An agency's interpretation or application of a statute is a question of law that we generally review de novo. Brower v. Evans, 257 F.3d 1058, 1065 (9th Cir. 2001). But "when it appears that Congress delegated authority to [an] agency generally to make rules carrying the force of law, and that the agency interpretation... was promulgated in the exercise of that authority," the agency interpretation may be rejected only if it is unreasonable or contrary to clear congressional intent. United States v. Mead Corp., 533 U.S. 218, 226-27, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001) (citing Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)). An agency interpretation of a different form is not afforded such deference, but is nonetheless given some weight. Id. at 234-35, 121 S.Ct. 2164.
 
 
 DISCUSSION
 
 
 16
 
 I. The Commission's Findings of Fraud.
 
 
 
 17
 The Commission found fraud in violation of Securities Act § 17(a), 15 U.S.C. § 77q(a), and Exchange Act § 10(b), id. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5; fraud in violation of the Advisers Act § 206(1) and (2), 15 U.S.C. § 80b-6(1)-(2);[4] and false statements to the Commission in violation of Advisers Act § 207, id. § 80b-7. Advisers Act § 207 criminalizes willfully making false statements of material fact, or material omissions, in applications or reports to the Commission, such as a Form ADV. Id. Advisers Act § 206 prohibits advisers from, directly or indirectly, employing a scheme to defraud clients or engaging in practices which operate as a fraud upon clients. Id. § 80b-6(1)-(2). Exchange Act § 10(b) criminalizes employing deceptive devices in connection with the sale of securities in violation of Commission rules, id. § 78j(b); Rule 10b-5 prohibits, as such a deceptive device, the use of fraudulent schemes or business practices and prohibits making false statements of material fact or misleading material omissions. 17 C.F.R. § 240.10b-5. Securities Act § 17(a) criminalizes the use of fraudulent schemes or business practices and criminalizes obtaining money by making false statements of material fact or misleading material omissions. 15 U.S.C. § 77q(a). Although scienter is required for some of these violations, the element of a materially false statement is satisfied by essentially the same conduct for all of the statutes in question.
 
 
 18
 
 A. Petitioners Made Materially False Statements.
 
 
 
 19
 We have no trouble concluding that the petitioners made materially false statements when they claimed not to recommend securities in which they had an ownership or sales interest, not to receive economic benefits in connection with giving advice to clients, and not to recommend securities in which they had a financial interest. It is indisputable that potential conflicts of interest are "material" facts with respect to clients and the Commission. See, e.g., SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 201, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963) (noting that an investment adviser must "fully and fairly reveal[] his personal interests in [his] recommendations to his clients").
 
 
 20
 Two aspects of the SSA created a financial interest for the petitioners to recommend PPF funds to their clients. First, the minimum investment provision created an incentive for the petitioners to convince their clients to invest a total of at least $1,000,000 in PPF funds; otherwise they would not have received any payment under the SSA. When a person's payment is contingent on his or her clients investing a minimum amount of money, that person has a financial interest in recommending the investment until that amount of money has been reached.
 
 
 21
 The second aspect of the SSA, the system of "caps," continued to create a financial interest in recommending PPF funds even after the minimum investment provision had been satisfied. We need not decide whether the SSA caps facially created a financial interest because it is obvious that they did so in practice. As noted above, Vernazza indicated that H&V had performed work in excess of the compensation it was entitled to under the caps, and thus the balance was carried forward. At this point, as long as a balance was carried forward, H&V's compensation was wholly dependent on the amount of money invested by its and IMS's clients. When compensation is predicated entirely on the amount of money invested in a fund by a person's clients, that person has a financial interest in recommending that fund. The petitioners had a financial interest in recommending PPF funds, and their representations to the contrary were false statements of material fact.
 
 
 22
 Petitioners argue that the Commission erred by not crediting Vernazza's testimony that he put in substantial work under the SSA and kept records of this work, thus finding that the work performed under the SSA was minimal. As long as a balance was carried forward, however, the amount of work actually performed under the SSA is irrelevant. Petitioners still had a financial interest in recommending World's funds, even if they also needed to, and in fact did, perform other services under the SSA.[5]
 
 
 23
 
 B. Substantial Evidence Supports the Commission's Finding of Scienter.
 
 
 
 24
 It is undisputed that scienter is a required element for violations of Securities Act § 17(a)(1), Exchange Act § 10(b) and Rule 10b-5, and Advisers Act § 206(1). Scienter is not required for the other violations of the Advisers Act. The parties do, however, dispute the meaning of "scienter"; the petitioners suggest that scienter requires specific intent to defraud.
 
 
 25
 In this Circuit, a violation of Exchange Act § 10(b) and Rule 10b-5 may be supported by "knowing or reckless conduct," without a showing of "willful intent to defraud." Nelson v. Serwold, 576 F.2d 1332, 1337 (9th Cir.1978); see also Howard v. Everex Sys., Inc., 228 F.3d 1057, 1063(9th Cir.2000). A similar showing is required for violations of Securities Act § 17(a)(1). See, e.g., SEC v. Dain Rauscher, Inc., 254 F.3d 852, 856 (9th Cir.2001). We apparently have never considered what constitutes scienter under Advisers Act § 206(1), but because its language is nearly identical to that of Securities Act § 17(a)(1),[6] we now hold that the same definition — knowing or reckless conduct — applies to Advisers Act § 206(1).
 
 
 26
 Citing the testimony of Vernazza, Hall, and Hargrave, the Commission found that each had knowledge of the caps under the SSA and that each had reason to know of the false statements made in the Forms ADV and disclosure statements.[7] The Commission held that the petitioners had a duty to disclose potential conflicts of interest accurately, and that even if the petitioners' failure to disclose was unknowing, it was reckless. The Commission found it implausible that the petitioners were ignorant of this duty, or that the failure to do so was merely an oversight, and therefore determined that the petitioners had the requisite scienter.
 
 
 27
 Petitioners argue that, because there is no direct evidence of their intent to defraud their clients, the Commission's finding of scienter lacks substantial evidence. We are not persuaded. The Commission identified the applicable standard of care correctly and had the requisite evidentiary basis to conclude that the petitioners were in violation.
 
 
 28
 The Commission correctly determined that the petitioners had a duty to disclose any potential conflicts of interest accurately and completely, and to recognize that the SSA created such a potential conflict. Although the Commission's determination of the duty of care is not the kind of formal interpretation that is entitled to Chevron deference, "an agency's interpretation may merit some deference whatever its form, given the `specialized experience and broader investigations and information' available to the agency." Mead Corp., 533 U.S. at 234, 121 S.Ct. 2164 (quoting Skidmore v. Swift & Co., 323 U.S. 134, 139, 65 S.Ct. 161, 89 L.Ed. 124 (1944)). In this case, we defer to the Commission's experience and expertise in determining that investment advisers are knowledgeable enough to recognize that an arrangement such as the SSA creates potential conflicts of interest.[8]
 
 
 29
 The Commission's determination that the petitioners either knowingly or recklessly violated their duties is supported by substantial evidence. The Commission is entitled to draw inferences from the evidence, including an inference that the petitioners' failure to disclose their potential conflict of interest was not merely an innocent oversight. As the Second Circuit determined in a similar context, the petitioners' arguments
 
 
 30
 misapprehend the nature of our review of an administrative agency's decision. Petitioners essentially argue that this court should draw inferences from the evidence contrary to those drawn by the Commission. In other words, they ask us to "supplant the [administrative agency's] reasonable determinations." Cellular Tel. [Co. v. Town of Oyster Bay], 166 F.3d [490,] 494 [(2d Cir.1999)]. But based on the record ... we cannot say that the SEC lacked "such relevant evidence as a reasonable mind might accept as adequate to support [its] conclusion." Universal Camera Corp. v. NLRB, 340 U.S. 474, 477, 71 S.Ct. 456, 95 L.Ed. 456 (1951) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)) (internal quotation marks omitted). We thus uphold the SEC's finding of scienter.
 
 
 31
 Valicenti Advisory Servs., Inc. v. SEC, 198 F.3d 62, 65 (2d Cir.1999) (first and fifth alterations in original) (parallel citations omitted). The record supports the Commission's conclusion that the petitioners acted knowingly or recklessly in failing to disclose the required information and affirmatively misstating the nature of their agreement with World.
 
 
 32
 
 II. The Exclusion of Expert Testimony.
 
 
 
 33
 IMS argues that the ALJ erred in excluding "expert" testimony of a lawyer who, in IMS's words, "would have testified to the complexities of the Form ADV and the difficulties in answering some questions on the form due to ambiguous terms." IMS suggests that the expert's testimony was relevant to show the standard of care applicable to completing Forms ADV, which in turn is relevant to show whether the petitioners were reckless in erroneously filling out the forms, which in turn is a possible basis for scienter. The Commission concluded that "[w]hether Form ADV is difficult or not is irrelevant; investment advisers are obligated to respond to questions in Form ADV correctly and seek whatever assistance they need in fulfilling this obligation."
 
 
 34
 The Commission did not err in excluding the expert testimony. In general, expert testimony as to industry practice is relevant to show the standard of care necessary to a recklessness inquiry. See Dain Rauscher, 254 F.3d at 856-57. Nonetheless, that standard is ultimately one of "reasonable prudence, whether it usually is complied with or not." Id. at 856 (internal quotation marks omitted). As noted above, we defer to the Commission's conclusion that the standard of care in this case required the petitioners to correctly identify the potential conflicts of interest created by the SSA. Having determined that, in this case, the petitioners were obligated to answer questions regarding financial interests accurately, the Commission need not have accepted expert testimony that purported to show that other investment advisers would not have answered these questions correctly. Again, we note that the Commission's expertise in regulating investment advisers is worthy of deference. See Mead, 533 U.S. at 234, 121 S.Ct. 2164.
 
 
 35
 We do not approve of the Commission's general statement that "[w]hether Form ADV is difficult or not is irrelevant," which implies that a strict liability standard always applies to the identification of conflicts of interest. In a different case, where the financial interests are more complex or uncertain, an investment adviser might not be reckless to answer a particular question incorrectly or incompletely. In such a case, expert testimony might also be relevant to determine whether the adviser's conduct is so far outside the range of reasonable conduct so as to be considered reckless. But this is not such a case. We agree with the Commission that expert testimony was unnecessary here because the answers given by petitioners were so clearly misleading or erroneous as to be "highly unreasonable act[s] or omission[s]." Dain Rauscher, 254 F.3d at 856.
 
 
 36
 
 III. The Appropriateness of the Sanctions Imposed.
 
 
 
 37
 The Commission ordered the petitioners to disgorge the amount received by H&V under the SSA, ordered a suspension of IMS as an adviser for six months, and barred Vernazza, Hall, and Hargrave from associating with advisers for six months. The petitioners argue that these sanctions — and especially the suspensions — are impermissibly punitive, unduly harsh, inconsistent with similar cases, and untimely. Advisers Act § 203 provides that the Commission may suspend the registration of registered advisers or bar association with advisers as a penalty for making false material statements, and may impose monetary penalties for any violations of the Securities Act, the Exchange Act, or the Advisers Act. 15 U.S.C. § 80b-3. Each of these penalties is authorized only when it is "in the public interest." See id. § 80b-3(e), (f), (i). We will find a Commission sanction to be an abuse of discretion only if we find that such a sanction "is unreasonable or that it is `unwarranted in law or without justification in fact.'" Krull, 248 F.3d at 915 (quoting Hateley v. SEC, 8 F.3d 653, 655 (9th Cir. 1993)).
 
 
 38
 In support of their arguments that the suspensions are too punitive or too harsh, the petitioners cite six allegedly similar Commission cases in which the sanctions did not include a suspension. There are significant differences between this case and the other Commission orders; none of the cases cited considered the scheme at issue here, each of them was settled, and in each case, the Commission either considered remedial actions already taken by the adviser or the adviser agreed, as part of the settlement, to institute policies and procedures to prevent future violations. See Duff & Phelps Inv. Mgmt. Co., Advisers Act Release No. IA-1984, 75 S.E.C. Docket 2362 pt. IV & VI, 2001 WL 1152581, at *10-13 (Sept. 28, 2001); Sage Advisory Servs. LLC, Advisers Act Release No. IA-1954, 75 S.E.C. Docket 1073 pt. IV, 2001 WL 849405, at *9 (July 27, 2001); Fleet Inv. Advisors, Inc., Advisers Act Release No. IA-1821, 70 S.E.C. Docket 1217 pt. IV, 1999 WL 695211, at *9 (Sept. 9, 1999); Renaissance Capital Advisors, Inc., Advisers Act Release No. IA-1688, 66 S.E.C. Docket 408 pt. V & VI, 1997 WL 794479, at *5-7 (Dec. 22, 1997); Oakwood Counselors, Inc., Advisers Act Release No. IA-1614, 63 S.E.C. Docket 2034 pt. V, 1997 WL 54805, at *5-6 (Feb. 10, 1997); S Squared Tech. Corp., Advisers Act Release No. IA-1575, 62 S.E.C. Docket 1446 pt. VI, 1996 WL 464141, at *6 (Aug. 7, 1996). Furthermore, the cases demonstrate a range of sanctions, from simple disgorgement to fines as high as $100,000 and bans on accepting new clients. See, e.g., Duff & Phelps Inv. Mgmt. Co., 75 S.E.C. Docket 2362 pt. VI, 2001 WL 1152581, at *10 (imposing sanctions including a $100,000 fine); Renaissance Capital Advisors, Inc., 66 S.E.C. Docket 408 pt. VI, 1997 WL 794479, at *7 (imposing sanctions including a ban on new clients for sixty days).
 
 
 39
 These cases do not show that disgorgement and a six-month suspension in this case, in which the petitioners neither took remedial action nor settled with the Commission, is unwarranted or unjustified. The Commission pointed out that the petitioners'
 
 
 40
 conflict of interest put them in a position where their recommendations to their clients could be more influenced by their own financial interest than by an assessment of client need. Clients were harmed because they were deceived.... Moreover, [petitioners'] fraudulent scheme spanned several years.... [T]heir failure to grasp the obligation to disclose ... evidences a disturbing misapprehension of their duties towards their clients. [Petitioners'] occupations present opportunities for similar future violations.
 
 
 41
 Given these considerations, we are not convinced that imposing a six-month suspension is unreasonable.[9]
 
 
 42
 The petitioners also argue that the Commission's sanctions are untimely, both because the Commission did not institute formal proceedings against them until 1996, and because the Commission then waited three years to decide their appeal from the ALJ. We will not consider the former argument because the petitioners failed to raise it before the Commission, and no reasonable grounds for this failure are evident. See Securities Act § 9(a), 15 U.S.C. § 77i(a) (requiring that issues first be raised before the Commission); see also Exchange Act § 25(c)(1), id. § 78y(c)(1); Advisers Act § 213(a), id. § 80b-13(a) (each requiring that issues first be raised before the Commission unless "reasonable grounds" for failing to do so are given).
 
 
 43
 The petitioners argue that the Commission waited an unreasonably long period of time before deciding their appeal from the ALJ, and that this delay undermines the Commission's stated rationale for the suspensions — that the petitioners might repeat their wrongful conduct. Petitioners have not pointed to any evidence of lackadaisical conduct on the part of the Commission or of any improper reason for the delay. We decline to conclude that a delay, absent such evidence, undermines the Commission's position that suspensions are necessary to prevent repeated violations by petitioners.[10]
 
 
 44
 
 IV. The Commission's Authority to Bar Association with Unregistered Advisers.
 
 
 
 45
 Vernazza argues that the Commission lacks the authority to bar him from associating with unregistered, in addition to registered, investment advisers. This argument challenges the unambiguous language of the statute, which allows the Commission to bar violators "from being associated with an investment adviser," 15 U.S.C. § 80b-3(f), where "investment adviser" is defined as "any person who ... engages in the business of advising others" about securities. Id. § 80b-2(a)(11) (emphasis added).
 
 
 46
 We decline to consider this issue because Vernazza did not raise it before the Commission. As noted above, the judicial review provision of the Securities Act requires issues to be raised before the Commission, see id. § 77i(a); the judicial review provisions of the other acts include the same requirement, but allow exception if "reasonable grounds" are shown for failing to raise the issue before the Commission. See id. §§ 78y(c)(1), 80b-13(a). In his brief before the Commission, Vernazza argued only that the Commission had no authority to suspend him because he was no longer a registered adviser, an argument he does not repeat here; he did not argue that the Commission lacked authority to suspend him from associating with unregistered advisers. In his briefs before this Court, Vernazza has offered no "reasonable grounds" for failing to make this argument before the Commission. Thus, we lack jurisdiction to hear this argument.
 
 
 47
 PETITION DENIED.
 
 
 
 Notes:
 
 
 [1]
 A June 10, 1992, fax from Vernazza to Hall and Hargrave, as well as Vernazza's testimony, suggests that petitioners and World did not want to cover the closing costs out of the Tax Fund itself because the payment of the closing costs would have resulted in a loss in the fund's net asset value
 
 
 [2]
 Vernazza apparently had already refunded some of this amount to the relevant clients
 
 
 [3]
 The Commission noted that the suspension of Vernazza's registration was moot, since Vernazza had withdrawn his registration in 1997
 
 
 [4]
 Because Hall and Hargrave were not themselves registered advisers, their liability under the Advisers Act was premised on the theory that they caused, or aided and abetted, IMS's violations
 
 
 [5]
 Vernazza's own testimony on this matter was equivocal. The hearing officer first asked why he needed to reconstruct records of the hours worked "if you had already been doing it periodically to send to World Money Management?" Vernazza replied, "We hadn't been." He then stated:
 Actually, I did have some compilation — at the end of 1993 when I had the surgery and also at that particular time the lack of cooperation started from World Money Managers and then subsequently — I don't know if this has anything to do with it — but subsequently in 1994 they were under investigation by the Securities and Exchange Commission and everything just stopped. So then in 1994 when I went back to provide this information for the [Commission] Staff, I looked for some of that information and it was not there so I reconstructed the best I could.
 This testimony is not sufficient to compel a conclusion that the Commission erred in not crediting Vernazza's accounting of the hours he worked.
 
 
 [6]
 Advisers Act § 206(1) provides that it is unlawful for an investment adviser "to employ any device, scheme, or artifice to defraud any client or prospective client." 15 U.S.C. § 80b-6(1). Securities Act § 17(a)(1) provides that it is unlawful for anyone, in the sale of securities, "to employ any device, scheme, or artifice to defraud."Id. § 77q(a)(1).
 
 
 [7]
 The Commission found that Vernazza filed his own Form ADV, that Hargrave filed IMS's Form ADV with Hall's assistance, that Vernazza prepared his own disclosure statements, that Hargrave prepared his own and Hall's disclosure statements, and that Hall reviewed his disclosure statements
 
 
 [8]
 We do not mean to suggest that investment advisers are always held to a strict liability standard for recognizing potential conflicts of interest. In this case, however, the Commission was entitled to conclude that any competent investment adviser would have recognized that the SSA created such a potential conflict, and that the petitioners' failure to identify the conflict was either knowingly or recklessly in disregard of their duties
 
 
 [9]
 Vernazza also argues that the suspension was impermissibly based upon his decision to mount a vigorous defense. The record does not support this contention; it demonstrates only that the Commission was concerned about further violations because the petitioners had repeatedly failed to understand their duty to disclose under the circumstances
 
 
 [10]
 The petitioners cite adictum from one of our sister circuits noting that a five-year delay was inconsistent with the Commission's professed concern for repeat violations. See Johnson v. SEC, 87 F.3d 484, 490 n. 9 (D.C.Cir.1996). That case concerned a delay in initiating proceedings, however, not a delay in deciding an appeal after proceedings were initiated. See id.