SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

v.

TLC INVESTMENTS AND TRADE CO.; TLC America, Inc. d.b.a. Brea Development Company; TLC Brokerage, Inc., d.b.a. TLC Marketing; TLC Development, Inc.; TLC Real Properties, RLLP–1; Ernest F. Cossey a.k.a. Frank Cossey; Gary W. Williams; Cloud & Associates Consulting, Inc.; and Thomas G. Cloud, Defendants.

No. SA CV 00–960 DOC.

United States District Court, C.D. California.

Oct. 15, 2001.

Sandra J. Harris, Arthur W. Richardson, Roberto A. Tercero, Lisa A. Gok, Patrick O. Hunnius, Marianne Wisner, Thomas A. Zaccaro, Rosalind R. Tyson, Los Angeles, CA, for Securities and Exchange Commission.

James L. Sanders, McDermott Will & Emery, Los Angeles, CA, for TLC America Inc.

H. Dean Steward, Kenneth M. Miller, Steward & Miller, Capistrano Beach, CA, for Ernest F. Cossey.

James D. Riddet, Stokke & Riddet, Santa Ana, CA, for Gary W. Williams.

Joshua Tropper, Gambrell & Stoltz, Atlanta, GA, for Cloud & Associates Consultin Inc. and Thomas G. Cloud.

Thomas M. Robins, III, Gary Owen Caris, Steven N. Bloom, Frandzel Robins Bloom & Csato, Los Angeles, CA, Byron Z. Moldo, Peter A. Davidson, Jr., Rein Evans & Sestanovich, Los Angeles, CA, for Robb Nmi Evans.

## ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

CARTER, District Judge.

Before the Court is Plaintiff Security and Exchange Commission's (SEC) motion for summary judgment against Defendants Cloud & Associates (C & A) and Thomas C. Cloud (collectively Cloud). After reviewing the moving, opposing, replying papers, and after oral argument on October 15, 2001, and for the reasons set forth below, the Court GRANTS Plaintiff's motion for summary judgment.

### I.

### BACKGROUND

This is a securities fraud case. From August 1998 through October 2000, Defendants TLC Investments & Trade Co., TLC America, Inc., TLC Brokerage, Inc., TLC Development, Inc., and TLC Real Properties RLLP–1 (collectively TLC) engaged in a nationwide real estate Ponzi scheme, raising over $150 million from nearly 2000 investors nationwide. TLC investors were typically senior citizens, many of whom invested their retirement or savings accounts into TLC's fraudulent schemes.

TLC's scheme was to represent to investors that it would use their money to refurbish and resell distressed real estate, which TLC guaranteed would create a rate of return between 8% and 15%. TLC represented that the investment would be secured by an interest in real property, which would be held by the investor and TLC as tenants-in-common. TLC did not fulfill these representations. Instead, TLC used invested money in a fraudulent bank scheme, spent millions of dollars to purchase racehorses and racing dogs, lent money to risky construction projects, and donated approximately $1.5 million of investor money to finance the re-furbishing of Defendant Cossey's son's high school football stadium. TLC's "investments" also yielded a significantly lower rate of return than represented, and TLC paid approximately $45 million in returns from investor funds.

Cloud, through C & A, acted as a sales agent for TLC's offering, raising approximately $12,614,575 from 295 investors while receiving $1,119,556 in commissions. Cloud had been in the business of providing investment advice for many years prior to selling TLC investments. Many of the people that he sold TLC investments to were long time clients. Additionally, Cloud found new clients from his appearances at various Christian-themed speeches and appearances on Christian Radio shows.

In 1998, Cloud offered investment opportunities in TLC's tax lien certificates. Cloud represented that investor funds would be highly secure and would have a rate of return between 12–14%. Cloud emphasized the value of these investments because they were secured by an interest in property, had guaranteed rates of return in a time when investors might fear a weakening in the stock market, and because the interest in property was documented on paper, they would not be subject to the potential pitfalls of Y2K.

Cloud advertised these investments on C & A's website, <http://www.cloudassoc.com>, in brochures sent to potential investors, and in a pamphlet that C & A published titled "Preserving Wealth, Volume II: Positioning Your Assets for the Year 2000." In these writings, Cloud repeated the fraudulent representations made by TLC: a guarantee of a high, fixed, rate of return; that title to the properties would be taken in the name of the investor and TLC as tenants-in-common; and that investor money would only be used to buy and refurbish the distressed properties.

Cloud made several other representations in addition to those made by TLC. Cloud represented that: he had performed due diligence in insuring that TLC was a sound investment; TLC had a good track record with its investments; neither Cloud nor C & A would receive a commission from the investors; and that he was an experienced and trustworthy investment professional. These representations were not accurate.

Cloud performed very little independent investigation into TLC's activities. Cloud met with TLC's President Cossey and visited TLC's offices. Cloud did not perform a background check of either Defendants Cossey or Williams. Had he done so, he would have discovered Defendant Cossey's prior bankruptcy. Additionally, Cloud did not review TLC's financial records. At a January 1999 meeting of sales agents that Cloud attended, TLC distributed a letter disclosing that it had a deficit of more than $2 million, which it paid for by borrowing from future investment funds. Cloud also did not investigate to insure that TLC was recording the tax liens and property in the names of the investors as tenants-in-common. Another TLC sales agent, Laura

Davalos, heard from an investor that TLC was not recording title in the name of its investors. When she inquired about this, TLC acknowledged that it was not doing so, and she obtained a refund of the money her customers had invested plus the guaranteed interest.

Cloud's representations that TLC had a good track record were also inaccurate. TLC was losing money from very early in its lifespan, which Cloud knew or should have known through the distribution of the financial information at the January 1999 meeting. Cloud's representations about commissions was not entirely forthcoming either. C & A received commissions of 4–5% on TLC investments that it sold. Although the Commission was paid to C & A from TLC, and not directly from investors, investors were left to believe that Cloud was not receiving a financial benefit from promoting the TLC investments. Finally, Cloud did not disclose that he had been convicted in 1992 of conspiracy to commit tax fraud, despite his representations that he was a trustworthy investment professional.

The SEC brought suit against TLC, its principal officers Ernest Cossey and Gary Williams, C & A and Cloud, for violations of securities laws. On October 30, 2000, the Court appointed a Permanent Receiver to wind down TLC's businesses and distribute as much as possible to the defrauded investors. Defendants Cossey and Williams have both entered into consent judgments. C & A and Cloud are therefore the only remaining Defendants at issue.

The allegations in the First Amended Complaint against C & A and Cloud are for: (1) fraud in the offer or sale of securities in violation of section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a); (2) fraud in connection with the purchase or sale of securities in violations of section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5 thereunder, 17 C.F.R. § 240.10b–5; and (3) offer and sale of unregistered securities in violation of sections 5(a) and 5(c) of the Securities Act of 1933, 15 U.S.C. §§ 77e(a) and (c). Cloud does not dispute TLC's liability for securities violations. Instead, he contends that he is not liable for TLC's fraudulent scheme as he reasonably relied on the representations made by TLC, and did not himself violate any securities laws.

## II.

## DISCUSSION

### A. Legal Standard

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c).

The Court must view the facts and draw inferences in the manner most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). However, the existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; to defeat the motion, the non-moving party must affirmatively set forth facts showing there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact for trial. *Id.* at 256, 106 S.Ct. at 2514. When the non-moving party bears the burden of proving the claim or defense, the moving party can meet its burden by pointing out the ab-

sence of evidence of a genuine issue of material fact from the non-moving party. *Musick v. Burke,* 913 F.2d 1390, 1394 (9th Cir.1990). The moving party need not disprove the other party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–25, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986).

When the moving party meets its burden, the "adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party." Fed.R.Civ.P. 56(e). "The mere existence of a scintilla of evidence ... will be insufficient; there must be evidence on which the jury could reasonably find for [the opposing party]." *Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512.

**B.  Securities Fraud**

Both Section 17(a) of the Securities Act of 1933 [1] and Section 10(b) of the Securities and Exchange Act of 1934 [2] prohibit fraudulent practices in connection with the sale of securities. For the allegations relevant here, violation of Section 17(a) and 10(b) consist of the same elements of "making a material misstatement or omission in connection with the offer or sale a

of security by means of interstate commerce." *SEC v. Dain Rauscher, Inc.,* 254 F.3d 852, 856 (9th Cir.2001).

**1.  Materiality**

■ A fact is material if there is a substantial likelihood that a reasonable investor would consider it important in making an investment decision. *Basic, Inc. v. Levinson,* 485 U.S. 224, 231–232, 108 S.Ct. 978, 983, 99 L.Ed.2d 194 (1988). Cloud does not dispute the materiality of the misrepresentations and omissions at issue here. There is no dispute that reasonable investors would have considered it important in making an investment decision that: they did not have a guaranteed rate of return; they were not obtaining a recorded interest in real property; their money was being used in various improper schemes, including racehorses and paying returns of other investors; Cloud did not perform a reasonable investigation of TLC's finances, history, and operations; Cloud was receiving a commission; and that despite his representations of trustworthiness, Cloud had been convicted on tax fraud charges.

**2.  Duty to Disclose**

■ "[T]he duty to disclose arises when one party has information that the other party is entitled to know because of a fiduciary or other similar relation of trust and confidence between them." *Chiarella*

---

1.  Section 17(a) provides, *inter alia:*
    It shall be unlawful for any person in the offer or sale of any securities ... by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly ... to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made ....
    15   U.S.C. § 77q(a).

2.  Rule 10b–5 promulgated under Section 10(b) provides, *inter alia:*

    It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or any facility of any national securities exchange, ... to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made ....
    17   C.F.R. § 240.10b–5.

*v. United States,* 445 U.S. 222, 228, 100 S.Ct. 1108, 1114, 63 L.Ed.2d 348 (1980). To determine whether a person has a duty to disclose, a court examines five factors: "(1) the relationship of the parties, (2) their relative access to information, (3) the benefit that the defendant derives from the relationship, (4) the defendant's awareness that the [investor] was relying upon the relationship in making his investment decision, and (5) the defendant's activity in initiating the transaction." *Paracor Finance, Inc. v. General Elec. Capital Corp.,* 96 F.3d 1151, 1157 (9th Cir.1996). Here, all factors show that Cloud had a duty to disclose. He was a long-time financial advisor to many clients, held himself out as an experienced professional, had far greater access to TLC's information than the investors, gained a benefit by receiving a commission for every sale, was aware that the investors relied on his advice, and he began advertising the opportunity to invest in TLC. Cloud therefore had a duty to disclose all material information.

### 3. Scienter

■ A plaintiff must prove scienter in order to establish a claim under sections 17(a) and 10(b). *Aaron v. SEC,* 446 U.S. 680, 696–97, 100 S.Ct. 1945, 1955–56, 64 L.Ed.2d 611 (1980). Scienter may be shown by proving recklessness. *Hollinger v. Titan Capital Corp.,* 914 F.2d 1564, 1569 (9th Cir.1990). Recklessness is defined as "an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Id.* A showing by a plaintiff of a fiduciary's motive to engage in the fraud and information casting doubt on the truth of statements is strong evidence of recklessness. *See Howard v. Everex Sys., Inc.,* 228 F.3d 1057, 1064 (9th Cir.2000).

Cloud contends that he did not recklessly make false representations or omissions to investors. Cloud's only evidence consists of his declaration submitted for the purposes of this motion. Cloud declares "I did not recklessly represent anything fraudulent .... It was my understanding that investors always received their scheduled payments and if they did not roll over but withdraw from the program there were always paid the funds to which they were entitled." Cloud Decl. ¶ 7. Cloud also states that he "was not aware that TLC had lost money in 1998." Cloud Decl. ¶ 15.

The uncontroverted evidence in this case is to the contrary. Cloud received a 4–5% commission from TLC on every sale. He therefore had a motive to continue selling TLC investments and to turn a blind eye to negative information about TLC. Furthermore, Cloud admitted in his deposition that he was at the January 1999 meeting in Anaheim where TLC distributed a financial report showing that it had lost more than $2 million in 1998. That document was produced by Cloud during discovery as being in his possession. If Cloud was not aware of the contents of the document, it can only be explained by his reckless failure to read the financial documents that TLC gave him. This is an absolute minimum requirement of a person who represents, as Cloud did in brochures, in person, and over the internet, that TLC had "a good track record."

Cloud did not make any serious independent investigations on his own. As he states in his declaration, "[a]ny information that I relayed to others was provided to me by TLC." Cloud Decl. ¶ 7. The extent of his due diligence was to speak to TLC's officers and visit their offices. This demonstrates both Cloud's recklessness and the falsity of his representations that he had conducted due diligence into TLC. A

simple investigation by Cloud would not only shown that TLC was not profitable, but that it was not taking title of the properties in the name of its investors. *See* Davalos Decl. ¶ 4.

Cloud did not investigate TLC even when another "fixed income" investment came into question. Cloud sold investments managed by Banyan International, Ltd. In Spring 2000, federal authorities seized Banyan's assets. When one of his clients, Gwenda Smith, inquired about TLC's security, Cloud told her that he had "perfect peace" with TLC's investments. Smith Decl. ¶ 22.

Cloud's ignorance of documents supplied to him by TLC, his failure to conduct an independent investigation, and his persistent representations in the face of financial troubles of similar investments, combined with his interest in selling TLC investments, prove recklessness.[3]

### 4. Misrepresentations and Omissions

■ Cloud disputes some, but not all, of the alleged misrepresentations and omissions. Cloud does not contest that he did not tell investors about his 1992 conviction for tax fraud. This alone might be sufficient to establish a violation of section 17(a) and 10(b). Cloud, however, contends that all of the fraudulent representations and omissions about TLC's investments were made by TLC, and that he merely passed on their advertising. This is not the case. Cloud published information about TLC's tax lien certificates on the C & A website, which explained the tax lien certificate programs, including the fraudulent representations about the guaranteed rate of return and that investors would hold the title as tenants-in-common with TLC. Posting this information on C & A's

website, as opposed to providing an internet hyperlink to TLC's website, gave it C & A's imprimatur of approval. Cloud also presented this information in brochures sent out by TLC and in his pamphlet "Preserving Wealth, Volume II." Many of these documents did more than repeat TLC's claims. In a brochure with C & A's logo on it, a Frequently Asked Question (FAQ) section includes the following:

**Question:**

What has C & A discovered concerning TLC's track record?

**Answer:**

They have an excellent record. To date, more than 99% of Tax liens they have purchased have been redeemed either by the Mortgage Company or the owner of the house. During TLC's research process, they look at ten houses but buy only three.

**Question:**

Why does C & A consider tax liens a safe investment?

**Answer:**

There are 6 primary reasons . . . .

Mary Moore Decl., Ex. 1 at 305. Those questions were not meant to show what TLC thought of its investment scheme, but to show C & A's faith in TLC's investment. C & A and Cloud were therefore not just passing on information, but were directly repeating the fraudulent representation themselves.

Cloud also contends that he made no representations in his individual capacity. This is also contradicted by the evidence. He is cited as the author of "Preserving Wealth" and is listed as the person giving

---

**3.** Only subsection (a)(1) of section 17 requires a showing of recklessness. Violations of sections 17(a)(2) and 17(a)(3) require only a

showing of negligence. *Dain Rauscher,* 254 F.3d at 856. SEC has met that standard to prove violation under section 17.

the information in most of C & A's other updates.[4]

The uncontroverted evidence therefore shows that Cloud and C & A committed violations of Section 17(a) of the Securities Act of 1933 and Section 10(b) of the Securities and Exchange Act of 1934.

## C. Securities Registration

■ Sections 5(a) and 5(c) of the Securities Act of 1933[5] prohibit the offer or sale of securities in interstate commerce unless the securities transactions have been registered with the SEC or are exempt. *SEC v. Murphy*, 626 F.2d 633, 640 (9th Cir. 1980). Cloud contends that the TLC investments were not securities, and therefore exempt from registration.

The definition of a "security" includes an "investment contract" under both the Securities Act of 1933 and the Securities and Exchange Act of 1934. 15 U.S.C. §§ 77b(a)(1) and 78c(a)(10). An investment contract is an: (1) investment of money, (2) in a common enterprise, (3) with an expectation of profits to come from the management of others. *SEC v. W.J. Howey Co.*, 328 U.S. 293, 301, 66 S.Ct. 1100, 1103, 90 L.Ed. 1244 (1946). Cloud

contends only that the TLC investments do not qualify as a common enterprise.

The Ninth Circuit recognizes two types of common enterprises: "vertical commonality," where the fortunes of the investors and the promoters are linked, and "horizontal commonality," where multiple investors pool their funds and receive a pro-rata distribution. *Hocking v. Dubois*, 885 F.2d 1449, 1455 (9th Cir.1989). Here, the TLC investments have vertical commonality. Under the plan as advertised, TLC and the individual investor would take title to property as tenants-in-common. TLC's fortunes were therefore inextricably linked to the fortunes of the individual investors. So long as the promoter's gain is contingent on the investor's gain, there is a common enterprise. *See SEC v. R.G. Reynolds Enterprises, Inc.*, 952 F.2d 1125, 1130 (9th Cir.1991).

## III.

## RELIEF

The SEC seeks: a permanent injunction against Cloud and C & A pursuant to 15 U.S.C. §§ 77t(d) and 78u(d); disgorgement of profits of $1,159,262.56, *see SEC v.*

---

4. Cloud asserts one more defense to the SEC's allegations. Cloud contends that he never said that C & A received no commissions, but rather that they did not receive a commission from funds paid by the investor. Technically, that is accurate. SEC, however, argues that all of TLC's money came from the investors in one way or another, and therefore is false. Furthermore, the fact that he was not receiving a commission may have led investors to believe that he was not pushing this investment for his own personal benefit, and therefore his assessment was completely unbiased. Non-disclosure might therefore be a violation of the securities law. The Court need not decide this discrete issue, however, as the rest of the evidence abundantly shows Cloud's and C & A's liability for securities fraud.

5. Section 5 provides, *inter alia:*

Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise . . .

It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security

. . .

15 U.S.C. §§ 77e(a), 77e(c).

*Rind,* 991 F.2d 1486, 1493 (9th Cir.1993); and civil penalties of $110,000 against Cloud and $550,000 against C & A, pursuant to 15 U.S.C. §§ 77t(d) and 78u(d)(3). Cloud and C & A do not oppose the injunction, and argue that the civil penalties and disgorgement are not proper only because the SEC has not carried its burden on summary judgment. Because the Court finds to the contrary, disgorgement and civil penalties will be ordered.

Cloud and C & A do not dispute the amount of the disgorgement, but only argue that they are entitled to offset the disgorgement by expenses they incurred, according to *SEC v. Thomas James Associates, Inc.,* 738 F.Supp. 88 (W.D.N.Y. 1990). The Court disagrees. "[E]xpenses in carrying out [a fraudulent] scheme and in defending himself are hardly appropriate or legitimate deductions." *SEC v. Dimensional Entm't Corp.,* 493 F.Supp. 1270, 1283 (S.D.N.Y.1980); *see also SEC v. Interlink Data Network of Los Angeles, Inc.,* No. Civ. A. 93–3073 R, 1993 WL 603274, Fed. Sec. L. Rep. P 98,049 (C.D.Cal. Nov. 15, 1993); *SEC v. Great Lakes Equities Co.,* 775 F.Supp. 211, 214 (E.D.Mich.1991); *SEC v. Benson,* 657 F.Supp. 1122, 1127 (S.D.N.Y.1987).

### IV.

### CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment, and entry of judgment for permanent injunction, disgorgement, and civil penalties, is GRANTED.

IT IS SO ORDERED.