COMMODITY FUTURES TRADING COMMISSION, Plaintiff,

v.

WALL STREET UNDERGROUND, INC., et al., Defendants.

No. CIV. A. 03–2193–CM.

United States District Court,
D. Kansas.

July 18, 2003.

Melanie D. Caro, Office of United States Attorney, Kansas City, KS, Rocell J. Cyrus, Clifford C. Histed, Rosemary Hollinger, Commodity Futures Trading Commission, Chicago, IL, for Plaintiff.

Anthony J. Durone, Nick Joseph Kurt, David L. Marcus, Berkowitz Stanton Brandt Williams & Shaw, LLP–KC, Kansas City, MO, for Defendants.

### *MEMORANDUM AND ORDER*

MURGUIA, District Judge.

This matter is before the court on plaintiff Commodities and Futures Trading Commission's Motion for a Preliminary Injunction (Doc. 15) against the defendants to enjoin alleged violations of the Commodities Trading Act (the "Act"). For the reasons set forth below, plaintiff's motion is granted.

## I. BACKGROUND

On April 22, 2003, the Commodity Futures Trading Commission filed a Complaint and a Motion for Preliminary Injunction. Plaintiff's complaint alleged that defendants Web Fulfillment Centre, Inc. and Frank Asaro, together with the other defendants, violated sections 4o (1)(A) and 4o (1)(B) of the Commodity Exchange Act, 7 U.S.C. § 6o (1)(A) and 6o (1)(B). On April 23, 2003, this court entered an Ex Parte Statutory Restraining Order ("SRO").

The court held a hearing on June 26, 2003, to examine evidence regarding plaintiff's Motion for a Preliminary Injunction. After hearing the testimony and argu-ments from counsel for all parties, the court took this matter under advisement. The court makes the following findings of fact and conclusions of law.

## II. FINDINGS OF FACT [1]

### A. The Parties

Defendant Wall Street Underground, Inc. (WSU) is a Delaware corporation. WSU has never been registered with plaintiff in any capacity. Defendant Web is a Delaware corporation. Defendant Web is located at 9003 W. 51st Street in Merriam, Kansas. Defendant Web acts as a customer service center for defendants Nicholas Guarino and WSU's customers; defendant WSU is defendant Web's sole client. Defendant Web has never been registered with plaintiff in any capacity.

Defendant Guarino resides in an unknown location. He was registered with plaintiff as a commodity trading advisor ("CTA") in 1985 and 1986. Defendant Guarino was also registered from 1984 to 1987 as an associated person through a gold and silver commodities firm of which he was the president and owner. Defendant Guarino is not currently registered with plaintiff in any capacity. In 1992, defendant Guarino was convicted of mail and wire fraud in connection with a scheme to sell gold and silver to the public. As a result, defendant Guarino was sentenced to 24 months imprisonment and was ordered to pay $1,250,678 in restitution to the clients whose funds he had commingled and misappropriated. To date, defendant Guarino has not satisfied the restitution order.

Defendant Asaro resides in Kansas City, Kansas, and has never been registered with plaintiff in any capacity. Defendant Asaro is the president and owner of defen-

---

1. During the hearing, the parties each presented evidence regarding matters that the court finds irrelevant to this inquiry. The court's finding of facts is limited to those facts the court considers relevant to plaintiff's request for injunctive relief.

dant Web and, at one time, he was responsible for defendant Web's day-to-day operations. Defendant Asaro met defendant Guarino while they were bunkmates in prison.

Defendant Derek Abrahams previously resided in the Grand Cayman Islands and now resides in an unknown location. Defendant Abrahams has never been registered with plaintiff in any capacity. Defendant Abrahams is responsible for all financial operations of defendants WSU and Web.

### B. Trading Systems and Promotional Materials

From at least January 1999 and continuing through the present ("the relevant time period"), defendants Abrahams, Guarino, and WSU have promoted and sold to the public several systems to be used for trading commodity futures and commodity options. They have overstated the profit potential of their trading systems, failed to warn of the risks inherent in trading commodity futures and commodity options, omitted facts about Guarino's criminal background and history of fraudulent conduct, and made false money-back guarantees. In addition, defendants WSU, Abrahams, Web, Guarino, and Asaro have participated in business practices that worked to deny customers the rebates to which they were entitled.

Throughout the relevant time period, defendants Abrahams, Guarino and WSU ("the Wall Street defendants") have engaged in the business of providing advice to clients as to the value or advisability of trading commodity futures and commodity options. They offer to clients and prospective clients a variety of trading systems under various names, including the *Samurai Forecaster, Nick's Guerilla Trading Hotline* and the *Electronic Wall Street Underground ("eWSU")* (collectively, the "trading systems"). In addition to the vari-

ous trading systems, the Wall Street defendants sell a bi-monthly *Wall Street Underground* newsletter ("Letter"). The bi-monthly Letter sells for approximately $100 per one-year subscription and includes recommendations on trading a variety of financial instruments, including commodity futures and commodity options. The Letter also promotes the sale of the trading systems.

The Letter and trading systems make specific buy and sell recommendations on commodity futures and commodity options, including gold futures, Japanese Yen futures and S & P 500 Index futures. The Wall Street defendants generally sell their trading systems for $5,000 per one-year subscription. Clients who subscribe to the trading systems are notified of the trading signals via beeper or pager, fax, and through the Internet. The Wall Street defendants promote the sale of their trading systems in the Letter, through the U.S. mail to subscribers of the Letter and to others, and over the radio.

Defendant Guarino is the author of the Letter, the designer of the trading systems, and the author of the promotional material for the Letter and trading systems. At certain points during the relevant period, defendant Web acted as the internal sales and customer service department for the Wall Street defendants. At these times, defendant Web distributed the Letter and other promotional materials only when an existing client called the customer service office and requested the materials, and defendant Web's representatives addressed customer service issues and answered phone calls from existing clients.

Throughout the relevant time period, the Wall Street defendants and the WSU promotional materials misrepresented the profit potential that could be realized from the use of their trading systems, failed to adequately warn of the risks inherent in

futures trading, and failed to state material facts concerning defendant Guarino's history of fraudulent conduct. For example, some promotions mailed to prospective clients from July 2002 through October 2002 contained the following false claims, among others:

> You will need to hire a top-notch tax accountant to help you legally shelter the incredible money you will be making ... Can you see going from trying to figure out how to pay all your bills to figuring out how to spend your millions? ... One million dollars in profits, guaranteed.... I have a strategy to turn every $10,000 invested in gold into $124,000 in just a few months ... My detailed, specific strategies can turn every $10,000 invested in the Dow into $2.5 million in 60–90 days ... My insider Yen trading techniques helped *eWSU* subscribers turn $5,000 Yen contracts into $3.6 million in just 14 months ... I haven't had a single losing trade recommendation this year. **Not One.**

(emphasis in original).

No WSU publication, and no employee of any of the defendants, informed prospective customers about defendant Guarino's previous censure for mishandling and commingling customer funds and for using deceptive and misleading promotional materials, nor did any employee inform clients that defendant Guarino had been convicted of mail and wire fraud in connection with his fraudulent offer to sell gold and silver to the public.

## C. False Money–Back Guarantees

During the relevant time period, the advertising in the Letter frequently included money-back guarantees, variously promising the return of all, double or a prorated part of the subscription price paid by the prospective clients if they were not fully satisfied with the performance of the trading systems and/or its trading recommendations. The defendants offered these guarantees by making various claims. For example, "A one-year subscription is $5,000. It comes with my full money-back guarantee. Either you make $100,000 in the next twelve months following the recommendations in the Samurai Forecaster or I'll refund your subscription fee ... Either you make a million dollars or you get a cashier's check for $10,000." The money-back guarantees were false because defendants systematically ignored, denied, discouraged or unreasonably delayed honoring clients' requests for refunds. The Wall Street defendants knew the guarantees to be false or had no reasonable basis to believe they would honor the guarantees at the time.

## D. Rebate Process and Denials

During the relevant time period, defendant Web was one of the entities responsible for explaining to clients the process for obtaining refunds. Defendant Web was also one of the entities responsible for processing the refund requests and sending the requests to defendant WSU for approval. Defendant Web employees told several clients who contacted defendant Web requesting refunds before their one-year subscription ended to call back after the subscription period ended. When the clients later called back, they were told that their requests were too late. Clients who called defendant Web to inquire about their refunds were routinely rerouted to various extensions until disconnected. Defendants occasionally sent refund checks that were not honored by the bank due to insufficient funds. Defendants also made many clients wait for their money for six months or more after requesting their refunds. Defendants have yet to make refunds to many customers, even a year or more after their requests. In other instances, defendants told clients that their refunds were being processed. When the clients called back later, they were told

that there was no record of their purchase or that their "name was not on the list." Many clients received their refunds only after the Kansas Attorney General's Office contacted certain defendants.

### E.  Web's Role in the Scheme

In 1993, defendants Guarino and Abrahams created defendant WSU to be a vehicle for the publication of the Letter and the creation of the trading systems. In February 1999, at defendant Abrahams' suggestion, defendant Asaro created defendant Web for the sole purpose of acting as an internal sales and customer service center for defendant WSU. During some parts of the relevant time period, clients and prospective clients of defendant WSU could only contact defendant WSU through defendant Web.

During the relevant time period, defendant Web accepted client orders, collected payments, and recommended futures commission merchants at which clients could open accounts and trade utilizing the trading systems' recommendations. Defendant Web shipped computers, facsimile machines, pagers, beepers, and welcome packages to existing clients. Defendant Web's customer service representatives gave clients instructions on how to use the computers and how to navigate through the defendant WSU's website, and the representatives affirmed the misrepresentations that defendant Guarino's advice was accurate and successful. Defendant Web's employees failed to inform clients of defendant Guarino's history of fraudulent conduct. While defendant Web did not author any of the promotional materials, many of the materials sent by defendant WSU contained defendant Web's return address. Neither defendant Web nor its employees made specific buy and sell recommendations to clients.

Defendant Web and defendant WSU commingled funds. Defendant Web accepted customer checks made payable to defendant WSU and transferred funds to defendant WSU. Defendant Web also received funds from defendants WSU and/or Abrahams to pay for day-to-day business expenses such as salary, rent and office equipment. In fact, defendant Abrahams and/or defendant WSU were responsible for approving all of defendant Web's expenses and purchases. In addition, defendant Asaro opened a checking account at Bank of America, N.A. in Wichita, Kansas, in the name "Web Fulfillment Centre, Inc. dba Wall Street Underground."

For the past two years, defendant Web's role has been limited to shipping orders for defendant WSU and handling refund requests for existing subscribers, including those subscribers who were having problems securing their refunds through other sources.

### F.  Frank Asaro's Role in Web

During the relevant time period, defendant Asaro was the president of defendant Web. After defendant Abrahams approached defendant Asaro with the idea to create defendant Web, defendant Asaro processed the necessary incorporation and tax documents. He was responsible for the daily operations of defendant Web and its employees, including paying taxes and payroll, hiring employees and purchasing equipment. Defendants Asaro and Abrahams coordinated the payment of defendant Web's operational expenses and client refunds. Defendant Asaro was responsible for signing checks for defendant Web's employees and client refunds. Defendant Asaro was primarily responsible for purchasing the computers that were sent to defendant WSU's clients.[2]

---

**2.** The court notes that plaintiff's Complaint contains allegations that defendant Asaro di-

Due to health problems, defendant Asaro has not been involved in the day-to-day operations of defendant Web for over two years.

### G. Derek Abrahams' Role in WSU and Web

In early 1999, defendant Abrahams approached defendant Asaro with the idea of creating defendant Web to service defendant WSU and its clients. Defendant Abrahams and/or defendant WSU[3] gave defendant Web money to pay everyday business expenses and to pay client refunds. Defendants WSU and/or Abrahams paid defendant Asaro to help market and distribute defendants Guarino and WSU's trading systems. Defendant Abrahams directed defendant Web employees to pay refunds to certain clients, particularly those who complained to the Kansas Attorney General, while denying other refund requests. Defendant Abrahams also participated in establishing leasing and rental agreements for defendant Web.

## III. CONCLUSIONS OF LAW

The Act provides in pertinent part that it is unlawful for a commodity trading advisor, by use of the mails or any means or instrumentality of interstate commerce: 1) "to employ any device, scheme, or artifice to defraud any client or prospective client or participant;" or 2) "to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or participant or prospective client or participant." *See* 7 U.S.C. § 6*o* (1)(A) and 6*o* (1)(B). Under the Act, a commodity trading advisor is defined as any person who, for compensation or profit, engages in the business of advising others, directly or through publications, writings or electronic media, as to the value or the advisability of trading in contracts of sale of a commodity for future delivery, commodity options or leverage transactions, or, as part of a regular business, issues or promulgates analyses or reports regarding the same. *See* 7 U.S.C. § 1a(6)(A).

Plaintiff has moved for a preliminary injunction pursuant to Section 6c(a) of the Act, 7 U.S.C. § 13a–1(a), prohibiting the movement or disposal of assets that are subject to plaintiff's claims. Plaintiff also seeks an order preserving defendants Web and Asaro's documents and records relating to their business association with defendant WSU.

In this case, a preliminary injunction is appropriate if plaintiff proves that defendants Web and Asaro violated the Act and that the violation is likely to continue unless enjoined. *See CFTC v. Hunt,* 591 F.2d 1211, 1220 (7th Cir.1979). A preliminary injunction is also appropriate if plaintiff proves, by a preponderance of the evidence, that the Wall Street Defendants

---

rected employees of defendant Web to deceive clients who called for rebates, to misdirect the calls and eventually disconnect them, and to extend clients' subscriptions without prior approval. However, plaintiff presented no evidence to support these allegations. Although plaintiff did prove that defendant Asaro instituted a "saves" program, which rewarded employees for convincing clients not to cancel subscriptions, the court concludes that this program does not violate any laws. One of the central functions of a customer service center is to deal with client concerns and maintain client business. The court,

therefore, concludes that plaintiff presented no evidence that defendant Asaro directed any employee of defendant Web to violate any provisions of the Act. The court does, however, infer that defendant Asaro knew of his employees' conduct, since he supervised defendant Web's day-to-day operations.

**3.** It is unclear from the record whether the money for defendant Web's expenses came from defendant Abrahams or defendant WSU. For purposes of this inquiry, however, the court need not address this question.

violated the Act, that these defendants are likely to continue the violation unless enjoined, and that defendants Web and Asaro acted in a common enterprise with the Wall Street defendants. *Sunshine Art Studios, Inc. v. FTC,* 481 F.2d 1171, 1175 (1st Cir.1973). Additionally, the court may issue a preliminary injunction against defendant Asaro if it finds that defendant Web is part of a common enterprise with the Wall Street defendants, that defendant Asaro is a controlling person of defendant Web, and that defendant Asaro either acted in bad faith or knowingly induced others to violate the Act. *In re First Nat'l Trading Corp.,* [1992–1994 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 26,142, at 41,787 (CFTC July 20, 1994).

### A. Violation of Act

Defendants Web and Asaro argue that they are incapable of violating the Act because they do not meet the definition of commodity trading advisors ("CTA"), as set forth above. The court agrees. There is no evidence in the record to support a finding that defendants Web and Asaro acted as CTAs. However, as set forth in detail below, the court concludes that defendants Guarino and WSU, while acting as CTAs, violated Section 4*o* (1)(A) and 4*o* (1)(B) of the Act, 7 U.S.C. §§ 6*o* (1)(A) and 6*o* (1)(B) (2001) and C.F.T.C. Regulation 4.41(a), 17 C.F.R. § 4.41(a) (2002), by misrepresenting and failing to disclose material facts and by conducting a business practice (e.g., the refund practice) which perpetrates a fraud upon customers.

### 1. Defendants Guarino and WSU Violated Sections 4*o* (1)(A) and 4*o* (1)(B)

■ Clearly, defendants Guarino and WSU have acted as CTAs in that the trading systems they author and sell provide specific recommendations for clients and prospective clients to use to trade commodity futures and commodity options.

Section 4*o* (1)(A) of the Act prohibits a CTA from employing a device, scheme or artifice to defraud any client or prospective client by the use of the mails or any means or instrumentality of interstate commerce. Section 4*o* (1)(B) of the Act prohibits a CTA from engaging in any transaction, practice, or course of business that operates as a fraud or deceit upon any client or prospective client. Section 4*o* (1) applies to all CTAs, whether registered, required to be registered, or exempted from registration. Commission Regulation 4.15, 17 C.F.R § 4.15; *In re R & W Technical Servs., Ltd.,* [1998–1999 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 27,582 (CFTC March 16, 1999), *aff'd in relevant part, R & W Technical Services, Ltd. v. CFTC,* 205 F.3d 165, 170 (5th Cir.2000), *cert. denied,* 531 U.S. 817, 121 S.Ct. 54, 148 L.Ed.2d 22 (2000) (prohibiting fraud by an unregistered CTA who sold trading systems to the public); *Commodity Trend Serv., Inc. v. CFTC,* 233 F.3d 981 (7th Cir.2000) (holding that CTAs who provide only impersonal advice are not subject to registration requirements of the Act but are subject to its fraud provisions).

■ Defendants Guarino and WSU's misrepresentations and deceptive omissions were material. A representation or omission is "material" if a reasonable investor would consider it important in deciding whether or not to make an investment. *CFTC v. R.J. Fitzgerald & Co.,* 310 F.3d 1321, 1329 (11th Cir.2002). Generally, misrepresentations and deceptive omissions concerning the likelihood of profiting from futures trading, such as those made by defendants Guarino and WSU, are material and violate the antifraud provisions of the Act. *See, e.g., CFTC v. Avco Fin. Corp.,* 28 F.Supp.2d 104, 115–16 (S.D.N.Y. 1998), *aff'd in relevant part in CFTC v. Vartuli,* 228 F.3d 94 (2d Cir.2000); and *First Nat'l Monetary Corp. v. Weinberger,*

819 F.2d 1334, 1340 (6th Cir.1987). Likewise, promises and guarantees of profit, in light of the uncertainties of the marketplace, are inherently fraudulent. *Munnell v. Paine Webber, Jackson & Curtis,* [1986–87 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 23,313 at 32,863 (CFTC Oct. 8, 1986). "Indeed, misrepresentations concerning profit and risk go to the heart of a customer's investment decision and are therefore material as a matter of law." *CFTC v. Noble Wealth Data Info. Servs., Inc.,* 90 F.Supp.2d 676, 686 (D.Md.2000).

Defendants Guarino and WSU failed to inform clients and potential clients that defendant Guarino had been convicted of mail fraud and wire fraud in connection with his misappropriation of over $1,250,678 in investor funds. This was clearly a material fact. *See SEC v. TLC Invs. and Trade Co.,* 179 F.Supp.2d 1149, 1153 (C.D.Cal.2001) (granting summary judgment for the SEC where defendant failed to disclose a prior conviction for tax fraud); *Pahmer v. Greenberg et al.,* 926 F.Supp. 287, 298 (E.D.N.Y.1996) (investors satisfied scienter requirement for alleging securities fraud where defendant failed to state that he was a convicted felon); and *Krauth et al. v. Executive Telecard, Ltd.,* 1994 WL 584556 (S.D.N.Y.1994) (defendant corporation's failure to inform investors that one of its directors had been convicted of securities fraud was material).

Defendants Guarino and WSU also deceived their customers and prospective customers by advertising a refund policy. Defendants Guarino and WSU advertised that customers would receive a 100% or prorated amount refund if they were dissatisfied with the product. Claims of a trading system refund policy "coupled with extravagant claims of false profits" demonstrates that the defendants misrepresented the existence of the substantial risks inherent in futures trading. *See R & W Technical Servs.,* 205 F.3d at 170. The court

further finds that the process by which defendants WSU and Web processed the refund requests acted as a fraud on their customers.

Defendants WSU and Web engaged in these activities by the use of the mails or other means or instrumentalities of interstate commerce, in that they made extensive use of telephones, facsimile transmissions and e-mails in the course of marketing their trading systems and processing rebate requests. *See AVCO,* 28 F.Supp.2d at 120 (telephones and faxes constituted instrumentalities of interstate commerce for the purpose of finding defendants liable for operating as unregistered CTAs under the Act).

**2. Defendants Guarino and WSU Violated Regulation 4.41(a) by Engaging in Fraudulent Advertising**

■ Regulation 4.41(a) makes it unlawful for any CTA to advertise in a manner that employs any scheme, device or artifice to defraud any client or prospective client. That regulation also prohibits advertising in any manner that involves any transaction, practice or course of business that operates as a fraud or deceit upon any client or prospective client. As stated earlier, defendants Guarino and WSU advertised the trading system in a manner that was misleading, omitted material information regarding the nature of trading of commodity futures and commodity options, and failed to inform customers of defendant Guarino's history of fraudulent conduct. Based on the conduct outlined in section III.A.1. above, defendants Guarino and WSU are liable for violating Regulation 4.41(a).

Since the court finds that defendants Guarino and WSU have violated the Act, the court may properly issue a preliminary injunction against defendants Abrahams, Web, and Asaro if plaintiff has carried its

burden under the common enterprise or controlling person theories. The court addresses each of these theories individually.

## B. Common Enterprise Theory

■■■ Where one or more corporate entities operate in a common enterprise, each may be held liable for the deceptive acts and practices of the other. *Sunshine Art Studios, Inc.,* 481 F.2d at 1175; *FTC v. Think Achievement Corp.,* 144 F.Supp.2d 993, 1011 (N.D.Ind.2000). Individuals may also be held to be participants in a common enterprise where the individual and the other members of the enterprise operate as a single economic entity. *See Sunshine Art Studios,* 481 F.2d at 1175; *Gibson v. FTC,* 682 F.2d 554, 568 (5th Cir. 1982). In determining whether a common enterprise exists, courts look to a variety of factors, including whether there is common control of the entities, whether the entities are distinct and operate at arms-length from one another, and whether the entities commingle funds. *See Sunshine Art Studios,* 481 F.2d at 1175.

### 1. Defendant Web is a Part of the Common Enterprise

■■ As described in detail above, defendant Abrahams controls defendant WSU, and defendants Abrahams and/or WSU control Web. Courts have long considered such common control to be indicative of a common enterprise for the purpose of attributing joint and several liability. *See id.* Defendants Web and WSU are not distinct entities and do not operate at arms length. In fact, defendant Web was created for the sole purpose of servicing defendant WSU exclusively. The only mailing address available for defendant WSU is the mailing address for defendant Web. At some points during the relevant period, defendant WSU advertised exclusively through defendant Web, which was the public's sole conduit to defendant WSU. *See Zale Corp. and Corrigan–Republic,*

*Inc. v. FTC,* 473 F.2d 1317, 1320 (5th Cir.1973); *Sunshine Art Studios,* 481 F.2d at 1174 (corporations that engaged in unified advertising were not distinct and constituted a common enterprise).

Defendants Web and WSU commingle corporate funds, and routinely transfer funds between themselves, as described in detail above. This activity is indicative of the existence of a common enterprise. *See SEC v. Elliott,* 953 F.2d 1560, 1565 n. 1 (11th Cir.1992); *Sunshine Art Studios,* 481 F.2d at 1174. Based on these findings, the court determines that defendant Web is a party to a common enterprise with defendants WSU and Guarino, and is, therefore, liable for defendants WSU and Guarino's actions.

### 2. Defendant Asaro is Not a Part of the Common Enterprise

■■ It is clear from the record that defendant Abrahams controlled defendant WSU and that defendants Abrahams and WSU controlled Web. It is also clear that defendant Abrahams shared control of defendant Web with defendant Asaro. However, there is no evidentiary support for the allegation that defendants Abrahams and Asaro are part of the common enterprise. As stated above, individuals can only be part of a common enterprise when they act as a single economic unit with the other parties to the enterprise. There is no evidence that defendants Abrahams and Asaro operated as a single economic entity with the other defendants. Moreover, there is no evidence of commingling or transactions that were not conducted at arms-length between defendants Abrahams, Asaro, and the other defendants. Based on these findings, the court determines that defendants Abrahams and Asaro are not part of the common enterprise and are not, therefore, liable for the enterprise's conduct under this theory. There-

fore, the only remaining theory under which injunctive relief is appropriate as to defendants Asaro and Abrahams is the controlling person theory.

## C. Controlling Person Theory

Under Section 13(b) of the Act, the court must find that defendants Asaro and Abrahams had control of entities within the enterprise and lack of good faith or knowing inducement of the acts constituting the violation. *In re First Nat'l Trading Corp.*, [1992–1994 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 26,142, at 41,787 (CFTC July 20, 1994).

■■■■■ A controlling person acts in bad faith if he does not "maintain a reasonably adequate system of internal supervision and control ... or [does] not enforce with any reasonable diligence such system." *Monieson v. CFTC,* 996 F.2d 852, 860 (7th Cir.1993). A person has the requisite degree of control to be a controlling person when he or she has "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person whether through the ownership of voting securities, by contract, or otherwise." *In re Spiegel,* [1987–1990 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 24,103 at 34,765 n. 4 (CFTC Jan. 12, 1988). It is the power to control that matters, not whether the power is exercised by actually participating in or benefiting from the illegal acts. *Monieson,* 996 F.2d at 860.

### 1. Defendant Abrahams is Liable Under a Controlling Person Theory [4]

■■■■ Defendant Abrahams controlled defendants Web and WSU and knowingly induced the acts set forth above that were in furtherance of the common enterprise's

violations of the Act. Defendant Abrahams was responsible for directing money to defendant Web for all of its operational expenses. When defendant Web relocated its offices, defendant Abrahams was responsible for paying for all relocation costs and approved the leasing agreement for defendant Web. Defendant Abrahams funded defendant Web's bank account at Firststar Bank in Kansas.

Defendant Abrahams instructed defendants Asaro and Web to sign refund checks on behalf of WSU. Defendant Abrahams made the ultimate decision as to which customers received a refund. Defendant Abrahams also instructed defendant Web to preserve customer subscriptions by denying or delaying the refunds. Defendant Abrahams paid all of defendant Web's start up costs including, but not limited to, incorporation fees, establishing leasing and rental agreements, Internet sites for defendant WSU and radio broadcasts.

Based on these findings, the court concludes that defendant Abrahams was a controlling person, that he acted in bad faith, and that he knowingly induced others to violate the Act. Therefore, the court concludes that defendant Abrahams is liable for the acts of the common enterprise under the controlling person theory.

### 2. Defendant Asaro is Liable Under a Controlling Person Theory

■■■■ Defendant Asaro created and is the president of defendant Web. Defendant Asaro controlled the day-to-day operations of defendant Web and was responsible for defendant Web's employees during the relevant time period. Although there is no evidence that defendant Asaro know-

---

**4.** There is insufficient evidence in the record for the court to determine whether defendant Abrahams was a CTA. This determination is not necessary to the court's inquiry, however,

as the court determines that defendant Abrahams is personally liable as a controlling person.

ingly induced the acts that were in furtherance of the common enterprise's violations of the Act, the court finds that defendant Asaro did not act in good faith. Defendant Asaro consulted with defendant Abrahams regarding the payment of operational expenses and customer refunds.[5] Defendant Asaro assisted with the marketing of the trading systems. Defendant Asaro was responsible for purchasing computers to ship to defendants Guarino and WSU's customers. Employees of defendant Web made misrepresentations to customers regarding the refund process, extended subscriptions without prior approval, and employed fraudulent practices to delay or avoid completely the refund of client subscriptions.

Defendant Asaro either failed to institute a policy to ensure that employees of defendant Web complied with requirements of the law, or defendant Asaro failed to enforce such a policy. Defendant Asaro did not direct employees of defendant Web to tell clients about defendant Guarino's criminal background.[6] The court believes this also evidences bad faith on defendant Asaro's part. Finally, defendant Asaro repeatedly denied that he opened a bank account at Bank of America on behalf of Web Fulfillment Centre, Inc., dba Wall Street Underground, Inc. Evidence presented by plaintiff at the preliminary injunction hearing proved that defendant Asaro's denials were false and that he did, indeed, open such a bank account. Defendant Asaro's credibility was undermined

by this evidence. The court believes defendant Asaro had knowledge of all of the activities of the enterprise that violated the Act. The court finds that defendant Asaro was a controlling person in the enterprise and that he acted in bad faith. Therefore, defendant Asaro is liable for the actions of the enterprise.

### D. Likelihood Violation Will Continue

"Actions for statutory injunctions need not meet the requirements for an injunction imposed by traditional equity jurisprudence. Once a violation is demonstrated, the moving party need show only that there is some reasonable likelihood of future violations." *Hunt,* 591 F.2d at 1220 (citations omitted). "While past misconduct does not lead necessarily to the conclusion that there is a likelihood of future misconduct, it is 'highly suggestive of the likelihood of future violations.'" *Id.* (quoting *SEC v. Mgmt. Dynamics, Inc.,* 515 F.2d 801, 807 (2d Cir.1975)). "In drawing the inference from past violations that future violations may occur, the court should look at the 'totality of circumstances, and factors suggesting that the infraction might not have been an isolated occurrence are always relevant.'" *Id.*

The court concludes that injunctive relief is appropriate in the instant action. The wrongdoing in this case is not founded on a single incident, but is systematic and integral to defendants' business.

---

**5.** Apparently, defendant Asaro consulted with defendant Abrahams without ever knowing where defendant Abrahams was located or how he could be reached. The fact that defendant Asaro was in business with defendants Guarino and Abrahams, and that defendants Guarino and Abrahams insisted that they contact defendant Asaro, and not vice versa, adds to the court's conclusion that defendant Asaro knew the legality of defendants' business dealings was questionable.

**6.** Defendant Asaro claims he did not know of defendant Guarino's history of fraud and his trading-related conviction. The court does not find this claim credible. Defendants Asaro and Guarino were bunk mates in prison. It would be unreasonable for this court to determine that, during their time in prison, the defendants never discussed the reasons for their incarceration.

Moreover, defendants Asaro and Web's arguments that their own conduct is blameless actually reinforce the court's opinion that an injunction is necessary. *See Hunt,* 591 F.2d at 1220 ("The fact that a violator has continued to maintain that his conduct was blameless has prompted several courts to look favorably on injunctive relief.") (citations omitted). Also, while defendant Web argues that it is no longer acting as a sales agent for defendant WSU, it is clear that defendant Web continues to process refund requests for defendant WSU. This process is a part of the fraudulent scheme. It is clear to the court that, unless enjoined, defendant Web will continue to process refunds as directed by defendants WSU and Abrahams. A preliminary injunction is, therefore, necessary.

Defendant Asaro points out that he no longer plays an active role in the day-to-day operations of defendant Web. However, defendant Asaro is still the president of defendant Web. Moreover, because the court has determined that defendant Asaro is personally liable as a controlling person, his personal assets may properly be used as restitution for the victims of the scheme.

**IT IS THEREFORE ORDERED THAT:**

1. Defendants are restrained, enjoined and prohibited, until further order of the court, from directly or indirectly:

A. Employing any device, scheme, or artifice to defraud any client or prospective client; or engaging in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective participant, by use of the mails or any means or instrumentality of interstate commerce, in violation of Section 4*o* (1) of the Act; and

B. Advertising in a manner which employs any device, scheme or artifice to defraud any client or prospective client; or advertising in a manner which involves any transaction, practice or course of business which operates as a fraud or deceit upon any client or prospective client, in violation of Regulation 4.41(a).

2. Defendants are further restrained, enjoined and prohibited, until further order of the court, from directly or indirectly:

A. Engaging in, controlling, or directing the trading of any commodity futures and options accounts, on their own behalf or on behalf of any other person or entity, whether by power of attorney or otherwise;

B. Introducing customers to any other person engaged in the business of trading in commodity futures and options;

C. Placing orders, giving advice or price quotations or other information in connection with the purchase or sale of commodity futures and options contracts for themselves and others; and

D. Otherwise engaging in any business activities related to commodity futures and options trading.

E. Advertising or offering to the public any product created by Wall Street Underground, Inc. including, but not limited to, Nick's Samurai Forecaster, Nick's Guerilla Trading Hotline and the Electronic Wall Street Underground.

3. Defendants are further restrained, enjoined and prohibited, until further order of the court, from directly or indirectly:

A. Destroying, mutilating, concealing, altering or disposing of any books and records, documents, correspondence, brochures, manuals, electron-

ically stored data, tape records or other property of defendants, wherever located, including all such records concerning defendants' business operations;

B. Refusing to permit authorized representatives of plaintiff to inspect, when and as requested by those representatives, any books and records, documents, correspondence, brochures, manuals, electronically stored data, tape records or other property of defendants, wherever located, including all such records concerning defendants' business operations; and

C. Withdrawing, transferring, removing, dissipating, concealing or disposing of, in any manner, any funds, or other property, wherever situated, including but not limited to, all funds, personal property, money or securities held in safes, safety deposit boxes and all funds on deposit in any financial institution, bank or savings and loan account held by, under the control of, or in the name of the defendants.

4. Until further order of this court, defendants and each firm, corporation, partnership, association or other person or entity which holds or is a depository of their funds, securities, assets or other property of any kind, are prohibited from directly or indirectly transferring, withdrawing, removing or disposing of any such funds, securities, assets or other property of, or within the custody, control or possession of defendants, including, but not limited to, all funds, personal property, money or securities held in safes, safety deposit boxes and all funds on deposit in any financial institution, bank or savings and loan account, including funds or property of investors, wherever located, whether held in the names of the defendants or otherwise.

5. The injunctive provisions of this Order shall be binding on defendants, upon any person insofar as he or she is acting in the capacity of officer, agent, servant, employee or attorney of defendants and upon any person who receives actual notice of this Order by personal service, facsimile or otherwise insofar as he or she is acting in active concert or participation with defendants.

6. Defendants shall prepare, sign and file with the court, within 30 days of this Order, a complete and accurate accounting for the period of January 1, 1999, to the date of such accounting, which shall be no earlier than the date of this Order. Such accounting shall include, without limitation, the identification of:

A. All funds, securities, commodity interests, assets and other property currently owned or controlled (legally, equitably or otherwise) directly or indirectly by defendants, whether individually or jointly;

B. All funds, securities, commodity interests, assets and other property received directly or indirectly by defendants, describing the source, amount, disposition, and current location of each listed item;

C. All funds, securities, commodity interests, assets and other property transferred or otherwise disposed of directly or indirectly by defendants, describing the source, amount, disposition, and current location of each listed item, including accounts or assets of defendants held by financial institutions located outside the territorial United States by signing the Consent to Release of Financial Records attached to the court's Order; and

D. The names and last known addresses of each bailee, debtor or other person or entity currently holding

any funds, securities, commodity interests, assets or other property owned or controlled (legally, equitably or otherwise) by defendants.

7. Defendants are directed to allow representatives of the plaintiff, when and as requested by those representatives, to inspect the books, records and other electronically stored data, tape recordings, and other documents of defendants and their agents, including all such records of his business operations, wherever they are situated and whether they are in the hands of defendants or others, and to copy said documents, data, and records either on or off the premises where they may be located.

8. Defendants are further ordered to immediately identify and provide an accounting for all assets and property that they currently maintain outside the United States, including but not limited to all funds on deposit in any financial institution, including but not limited to banks and brokerage houses, held by, under the control of, or in the name of the defendants, whether jointly or otherwise.

9. Within five (5) business days following service of this Order, each defendant shall transfer to the Web Fulfillment Centre, Inc. account at U.S. Bank Kansas City, Kansas, all funds located in foreign countries which are (1) titled in the name individually or jointly of such defendants; or (2) held by any person or entity for the benefit of any defendants; or (3) under such defendant's direct or indirect control, whether jointly or singly; and provide the plaintiff with access to all records of accounts or assets of the defendants held by financial institutions located outside the territorial United States by signing the Consent to Release of Financial Records attached to this Order.

10. This Order may be served by facsimile transmission.

11. This Order shall remain in effect until further order of the court and the court shall retain jurisdiction over this action to ensure compliance with this Order and for all other purposes related to this action.

## FRANK ASARO'S CONSENT TO THE RELEASE OF FINANCIAL RECORDS

I, Frank Asaro, do hereby direct each and every financial institution, including, but not limited to banks, trust companies and brokerage houses, at which I have an account of any kind upon which I am authorized to draw, to disclose all information and deliver copies of all documents of every nature in its possession or control which relate to said accounts to any attorney of the Commodity Futures Trading Commission, and to give evidence relevant thereto, in the matter of *Commodity Futures Trading Commission v. Wall Street Underground, Inc., Web Fulfillment Centre, Inc., Derek Abrahams, Nicholas A. Guarino, Jr. and Frank Asaro,* now pending before the United States District Court for the District of Kansas and this shall be irrevocable authority for so doing.

In addition to applying to all institutions located within, and subject to the laws of, the United States, this direction is intended to apply to the laws of countries other than the United States which restrict or prohibit the disclosure of bank information without the consent of the holder of the account, and shall be construed as consent with respect thereto, and the same shall apply to any account for which I may be a relevant principal. Copies of this document shall be considered as valid as the original and Frank Asaro consents to the service of copies of this document by facsimile or by U.S. mail.

WEB FULFILLMENT CENTRE, INC.'S CONSENT TO THE RELEASE OF FINANCIAL RECORDS

I, Frank Asaro on behalf of Web Fulfillment Centre, Inc. ("Web"), do hereby direct each and every financial institution, including, but not limited to banks, trust companies and brokerage houses, at which Web has an account of any kind upon which Web or a representative of Web is authorized to draw, and its officers, employees and agents, to disclose all information and deliver copies of all documents of every nature in its possession or control which relate to said accounts to any attorney of the Commodity Futures Trading Commission, and to give evidence relevant thereto, in the matter of *Commodity Futures Trading Commission v. Wall Street Underground, Inc., Web Fulfillment Centre, Inc., Derek Abrahams, Nicholas A. Guarino, Jr. and Frank Asaro,* now pending before the United States District Court for the District of Kansas and this shall be irrevocable authority for so doing.

In addition to applying to all institutions located within, and subject to the laws of, the United States, this direction is intended to apply to the laws of countries other than the United States which restrict or prohibit the disclosure of bank information without the consent of the holder of the account, and shall be construed as consent with respect thereto, and the same shall apply to any account for which I may be a relevant principal. Copies of this document shall be considered as valid as the original and Web consents to the service of copies of this document by facsimile or by U.S. mail.